IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RICK TARIQ RAHIM,<br>a/k/a Tariq Afzal Rahim,<br><br>Defendant. | Criminal No.: 1:23-CR-173 **AND** 1:24-CR-179<br><br>Sentencing Date: March 14, 2025<br>The Honorable Claude M. Hilton |

**UNITED STATES' POSITION ON SENTENCING**

Rick Rahim ("Rahim") is a serial offender and a serious criminal. This Court is sentencing him for two distinct schemes: employing tax fraud to cheat the public treasury of at least $4.4 million for his own gain and defrauding investors of at least $1.3 million more. Rahim is also awaiting sentencing in the Western District of Virginia for bribing a publicly elected sheriff in exchange for personal favors. In light of the nature and complexity of both frauds, the defendant's greed, and in order to promote deterrence, the United States requests the Court to sentence Rahim at the low-end of the 97 to 121 months Guidelines range, and three years of supervised release. The United States will also be seeking restitution and forfeiture, as agreed to in the plea agreement. Such a sentence is necessary to punish Rahim and to send a deterrent message to others that egregious criminal conduct will be met with serious consequences.

## I. BACKGROUND[1]

### *A. Tax Offenses*

For over a decade, Rahim enriched himself by cheating the IRS in numerous ways. Between 2009 and 2022, he evaded paying $977,874 that he owed in unpaid income taxes, penalties, and interest. PSR ¶¶ 45-52. Similarly, between 2015 and 2021, Rahim failed to pay

[1] The Presentence Report ("PSR), dkt. 63 as to 1:23-cr-173 and dkt. 30 as to 1:24-c-179, and both Statement of Facts ("SOFs") signed by the defendant adequately set forth the offense conduct in this case.

$866,615 in employment taxes, mostly trust fund taxes that he had withheld from his employees. *Id.* at ¶¶ 56, 60. To cap it off, Rahim has not filed a personal income tax return or paid *any* income taxes *since 2012*, despite earning gross income of more than $34 million between 2016 and 2022. *Id.* at ¶ 62. During that same period – from January 2012 through September 2021 – Rahim has, nevertheless, spent more than $2.6 million on mortgages, car payments, aviation expenses, and cryptocurrency and has withdrawn more than $1.5 million from his business bank accounts, much of it in cash increments less than $10,000. *Id.* at ¶¶ 51, 64.

*i. Evasion of Income Tax Liabilities*

By 2009, Rahim had failed to file numerous tax returns and owed substantial income taxes to the IRS. As a result of the IRS's collection efforts, Rahim filed an amended 2004 personal income tax return in October 2010 and a 2011 personal income tax return in October 2012, which reported that he owed taxes of $911,810 and $128,819, respectively. PSR, ¶¶ 40, 44. At the time Rahim filed his 2004 and 2011 returns, he did not pay any of the taxes. Thereafter, Rahim received numerous notices, each of which informed him of the amounts he owed the IRS. *Id.* at ¶¶ 41, 43, 45-47. Three of these notices were seized from Rahim's office during the execution of a search warrant in March 2022. *Id.* at ¶¶ 43, 46-47.

Rather than contesting the liability or paying the full amount he owed, Rahim stonewalled and deliberately sought to foil the IRS's collection efforts. To avoid an IRS levy on his personal bank accounts, Rahim paid his living expenses, including his mortgage and car payments, directly from his business bank accounts. *Id.* at ¶ 51. In addition, Rahim withdrew large amounts of cash from his business accounts in increments of less than $10,000, knowing – as he admitted to law enforcement – that keeping his withdrawals under $10,000 meant he did not have to file a Currency Transaction Report ("CTR"). *Id.* at ¶¶ 50-51. This had the three-fold effect of (1) keeping the balance in the business accounts low in case of an IRS levy, (2) ensuring that Rahim enjoyed a

steady supply of spending money safe from IRS seizure, and (3) avoiding CTRs, which might have invited IRS scrutiny of Rahim's financial transactions.

In August 2016, the Revenue Officer responsible for collecting the taxes directed Rahim to submit a Form 433-A, Collection Information Statement to the IRS. *Id.* at ¶ 48. The purpose of this Form 433-A was to allow the Revenue Officer to determine how much Rahim could afford to pay toward his tax liabilities. *Id.* at ¶ 38. Rather than accurately disclose his assets to the IRS, Rahim lied on his Form 433-A, which he signed under penalties of perjury, by omitting numerous assets he owned, including a rental property on Patowmack Drive in Great Falls, a 2006 Bentley, a 2008 Lamborghini, and a helicopter. *Id.* at ¶ 51.

Two weeks after submitting a false Form 433-A to the IRS, Rahim transferred his Patowmack Drive home, which he had left off the Form 433-A, to his wife's exclusive ownership. *Id.* at ¶ 68. Because Rahim's wife was not a part of the IRS's collection action, the IRS could not generally seize assets that were solely in her name or levy rental income from property that she alone owned– like the house on Patowmack Drive –in order to satisfy Rahim's tax liabilities. *Id.* When law enforcement questioned Rahim as to why he omitted the Patowmack Drive property from his Form 433-A, Rahim lied that the property was owned by his wife at the time. *Id.* Further, Rahim was previously caught on tape in an undercover operation in January 2020 boasting that he still owned the Patowmack Drive house. *Id.*

*ii. Failure to Account for and Pay Employment Taxes*

In addition to evading payment of his personal income taxes, between the fourth quarter of 2015 and third quarter of 2021, Rahim failed to account for or pay the IRS employment taxes— most of which he withheld from his employees' paychecks. *Id.* at ¶¶ 33, 56, 60. Over the years, Rahim has owned and operated numerous businesses. *Id.* at ¶ 30. These businesses used a third-party payroll processor, CBIZ, Inc. ("CBIZ"), to calculate their biweekly payroll. *Id.* at ¶ 56.

Between 2009 and October 2015, CBIZ provided Rahim's businesses with "full-tax" services, which included filing the businesses' quarterly employment tax returns, Forms 941 ("Forms 941"), withholding employment taxes on behalf of those businesses, and making periodic employment tax payments to the IRS on their behalf. In October 2015, CBIZ removed Rahim's businesses from the "full-tax" service because he had missed payment on multiple payrolls and instead placed the businesses on a "mini-tax" service. Under the "mini-tax" service, CBIZ did not file Forms 941, withhold employment taxes, or make tax deposits with the IRS on behalf of Rahim's businesses. They did provide him with completed Forms 941.

At the time Rahim's businesses converted to the "mini-tax" service, one of Rahim's employees, R.B., was managing payroll. In November 2015, R.B. emailed Rahim:

> "Under Mini-Tax we are responsible in payment [*sic*] the appropriate tax departments the tax liabilities. CBIZ does not file or pay it. I do not know how to prepare and file these taxes. Since employee paychecks have already been deducted for taxes they will need to be filed. Do you have a tax person that can file them? This also goes for filing quarterly tax returns. CBIZ will not handle."

Ex. 1, Nov. 2015 Email from R.B. to Rahim.

On January 26, 2016 – just before the deadline to file fourth quarter 2015 Forms 941 – R.B. emailed Rahim again to reiterate, that employee, employer, and unemployment tax returns and taxes were not being filed, reported or paid. Ex. 2, Jan. 2016 Email from R.B. to Rahim.

Despite R.B.'s pointed reminders, Rahim did not file Forms 941 for any of his businesses for *six years* between October 2015 through September 2021 or pay the taxes he withheld from employees' paychecks. PSR, ¶¶ 56-58. During this time, Rahim received biweekly notices from CBIZ indicating what employment taxes his businesses owed the IRS, including a breakdown of what had been withheld from employees' paychecks. *Id.* at ¶ 56. Nevertheless, Rahim did not pay any of these taxes to the IRS. *Id.* at ¶¶ 56-58. Moreover, Rahim chose not to file Forms 941 with the IRS, even though he received completed returns from CBIZ each quarter. *Id.* at ¶ 58. By not

filing Forms 941, Rahim avoided tipping off the IRS to his businesses' unpaid employment taxes.

At the same time that Rahim willfully failed to pay the taxes that he withheld from his employees' paychecks, he withdrew over $769,000 in cash from his business bank accounts. *Id.* at ¶ 61. He also used his business bank accounts to make more than $480,000 in car payments, including for a Bentley and three Lamborghinis, and to pay over $603,000 on mortgages held on three separate homes, including a beach house; his primary residence in Great Falls; and the Patowmack Drive property, which he hid from the IRS on his Form 433-A. *Id.* at ¶¶ 61, 68.

*iii. Failure to File Personal Income Tax Returns*

Finally, Rahim has not filed an income tax return since 2012 – well over a decade ago. *Id.* at ¶ 62. Rahim last filed a personal income tax return in October 2012, while the IRS was pursuing collection of his unpaid taxes. *See id.* at ¶ 44. Between 2016 and 2022 alone, Rahim and his businesses received gross income of at least $34 million. *Id.* at ¶ 63. As a result, Rahim has failed to pay between approximately $4.4 and $4.6 million in income taxes. *Id.* at ¶ 150.

***B. Rahim's Investment Fraud***

Rahim ran a sophisticated longstanding investment fraud scheme consisting of various iterations for which he defrauded over a thousand victims by hocking his supposed investment prowess for a fee. In reality, he was not a successful trader, instead he lost money. *Id.* at ¶¶ 135-136. Rahim charged his customers a monthly subscription fee (1) for use of his trading bots (which apparently traded on investors behalf by using a computer algorithm), (2) to access and follow his "callouts" (his trades were published on one of his private Discord channels) or (3) obtain another investment algorithm from him (which recommended trades, but did not automatically make the trades for the investor). *Id.* at ¶¶ 75, 95-97. Rahim committed this scheme by conspiring with

others, UCC-A (for BotsforWealth) and Ian Higgins[2] ("Higgins") (for TradeAutomation), as well as acting on his own (through ProChartSignals, OptionsCopier, CopyAndWin, SnipeAlgo, QQQTrade, and his lifetime memberships) with his employees' assistance. *Id.*; Ex. 3, ¶¶ 9-27, Special Agent Thomas Declaration.[3] Rahim made multiple material false statements during the scheme to convince his victims to pay the subscription fees. PSR, ¶¶ 101-103, 105, 113-114. Rahim also offered a lifetime membership, costing between $1,699 to $1,999, in which members received the ability to view all his private Discord channels and use his software products (not including the BotsforWealth and TradeAutomation bots). *Id.* at ¶ 97.

Rahim used a multifaceted strategy to lure victims to his scheme. Ex. 3, ¶ 23. Rahim harnessed internet-based social media tools, primarily TikTok and YouTube, to post videos in which he marketed himself as an extremely successful and knowledgeable trader. *Id.*; PSR, ¶ 94. His videos in turn directed investors to specific websites to purchase his various offerings. PSR, ¶¶ 94, 96; Ex. 3, ¶ 22; Ex. C to D, H to I. His scheme also involved extensive postings on Discord, which was integral to his fraud. PSR, ¶¶ 94, 96-97; Ex. 3, ¶ 23. Rahim used Discord to sell his software, discuss investing, as well as give updates to his customers as to the bots. PSR, ¶¶ 97, 121. He also had private Discord channels that he "called out" his trades for a fee. *Id.* at ¶ 127. Rahim used Discord to paint a false narrative about his investment software and advice. Specifically, Rahim deleted Discord comments by users he did not like or were negative about him. PSR, ¶ 137; Ex. 3, ¶ 23. He also created at least twenty fake Discord profiles to post emojis, likes, and symbols to make it appear that people were participating in discussions and positive

[2] Higgins pleaded guilty to conspiring with Rahim and UCC-2. 1:24-cr-26, Dkt. 7, 9. On August 28, 2024, he was sentenced by the Honorable Rossie D. Alston, Jr. and received the sophisticated means enhancement. Ex. 4, p. 14, Transcript of Sentencing Hearing for Ian Higgins.

[3] Special Agent Thomas's Declaration also includes Exhibits A through I.

about his callouts and software. PSR, ¶ 138; Ex. 3, ¶ 23.

Rahim used his wealth to sell his image of being a successful trader and convince people to purchase his subscriptions for investment advice. PSR, ¶ 98; Ex. 3, ¶ 24. He posted videos of his luxury home, luxury cars, office, and employees on social media to promote his image as a successful investor and recruit more subscribers to pay fees. *Id.* He also hosted "in-office" trading days to show first hand his trading and bolster his credibility. *Id.*

Rahim's initial iteration of the scheme involved BotsforWealth, which he launched in approximately 2021 with UCC-A. PSR, ¶ 99. Of note, Rahim met UCC-A on social media, lost money using UCC-A's bots, but went ahead and sold UCC-A's bots using his own brand name, BotsforWealth. Ex. 3, ¶ 9. To promote BotsforWealth, Rahim posted promotional materials including videos. *Id.*; PSR, ¶ 99. He made false claims about the coding of the bots, including his personal involvement. PSR, ¶ 101; Ex. 3, ¶ 10. He also falsely claimed to have back tested the bots. PSR, ¶ 102; Ex. 3, ¶ 10. On the BotsforWealth website, he posted specific false profit margins (of 76% for the Junior Bot and 90.3% for the Senior Bot). PSR, ¶ 102.

In order to invest using the bots, Rahim directed his subscribers to send cryptocurrency to a specific broker knowing it was offshore. Ex. 3, ¶ 10; Ex. A, p. 1. Specifically, in the FAQ section of the BotsforWealth website, Rahim touted "Yes, the Coinexx depository is in Singapore, so expect your wire instruction from Coinexx to be to a Singapore bank account." Ex. A, p. 5. Investors then had to follow specific steps to activate their bots and link them to Rahim's BotsforWealth website. PSR, ¶ 106. The bots failed with investors losing a significant amount of funds. *Id.* at ¶ 109. UCC-A and Rahim in turn blamed each other. *Id.* at ¶ 108; Ex. 3, ¶ 12. Until this point, investors believed Rahim developed and owned the bot software. Ex. 3, ¶ 12. In order to save face, he filed a lawsuit, which was eventually removed to this Court, but Rahim later dismissed it. *Id.* To further his fraud and false claims, Rahim sent an email to investors claiming

to need information regarding UCC-A to present to law enforcement and for the lawsuit. Ex. B, p. 1. Along with the email was Rahim's summary of the fraud committed by UCC-A. Ex. B, p. 2. He then directed his customers to fill out a "Victim Worksheet," which ironically asked if they wanted to be contacted by law enforcement. Ex. B at 3.

As detailed in Special Agent Thomas's declaration, law enforcement struggled with tracing the funds invested in BotsforWealth because of both the use of cryptocurrency and the offshore nature of the brokerage company for which records were not able to be obtained. Ex. 3, ¶¶ 13, 29-30. Indeed, the total amounts invested and lost by investors in BotsforWealth could not be determined. PSR, ¶ 110.

Instead of ending his bot centric business, three months after the BotsforWealth failure, Rahim partnered with Higgins, who owned the brokerage FX Primary ("FXP"), and UCC-2 so that he could offer another round of bots to his customers via his new company TradeAutomation. PSR, ¶ 110; Ex. 3 ¶ 14. In fact, Rahim referred to BotsforWealth and the differences to the TradeAutomation bots to lure customers to trust him again. PSR, ¶ 113. Rahim falsely claimed to fully develop and own the new bots, when he knew that Higgins and/or UCC-2 provided and controlled the algorithm. *Id.* Rahim made other materially false statements to his customers including touting his close relationship with FXP and that he had personally traded significant funds with FXP for six months, when he had not. *Id.* at ¶ 114. Exhibit C includes a screenshot of the TradeAutomation website, which details the false profit margins claimed.

In order to use the bots, investors had to take multiple steps, involving multiple websites, to link their bots between FXP and the website Rahim oversaw, TM Manager. PSR, ¶ 118; Ex. 3, ¶ 18. Separate and apart from linking the bots via the website, the investors had to send cryptocurrency offshore. Ex. 3, ¶ 16. Again, Rahim was well aware that he was directing his clients to send cryptocurrency offshore. *Id.* at ¶¶ 16-17. In the FAQ section of the FXP website, Rahim

noted, "No, FXPrimary is offshore." Ex. D, p. 2. Rahim again later repeats this claim stating, "[t]he exchange is located offshore" when explaining the tax benefits of making the investment and noting that there are "lack of identification requirements (know your customer)." *Id.* at p. 3. Rahim also confirmed the offshore nature of FXP in a Discord post, vouching for FXP and Higgins stating, "I vetted vetted. All high leverage forex brokers are offshore. I know the owner. He's in the USA." Ex. E, p. 1. And in another Discord post, Rahim wrote, "[g]ood luck finding any other offshore forex broker with principals right here in the U.S.… And, yes they are fully licensed and registered offshore." *Id.* at p. 2. These statements confirm that despite Higgins living in Tennessee, FXP was offshore. And Rahim knew it.

Like BotsforWealth, investors using TradeAutomation suffered significant losses. PSR, ¶ 121. But instead of allowing investors to withdraw funds, Rahim, along with Higgins and UCC-2, agreed to issue credits to investors so that clients could continue to trade, and Rahim and Higgins could continue to collect fees. PSR, ¶ 121; Ex. 3, ¶ 20. Rahim's own Discord posts corroborate his knowledge and involvement in issuing the credits. Ex. 3, ¶ 21; Ex. G. Specifically, he wrote "update on bot balances: I am expecting (hoping) the LP and FX Primary to finish their reconciliation and positing of credits to accounts by close of business tomorrow." Ex. G. Rahim took other steps to conceal the fraud to ensure investors kept paying. Specifically, Rahim requested that certain trades be deleted from the view so that clients could not see their unprofitable trades. PSR, ¶ 146.

Luckily, despite challenges tracing the funds invested using the TradeAutomation bots, in part because over 1,700 wallets were created for the cryptocurrency transfers, law enforcement was able to determine the loss because the company used by the offshore company had a U.S. location that responded to a subpoena. Ex. 3, ¶¶ 29-30. Through TradeAutomation, investors lost over $8,061,028, although a portion of this loss is due to Higgins stealing funds. PSR, ¶ 124.

Despite these failures, the defendant was committed to his investment advice fraud scheme. Separate and apart from BotsforWealth and TradeAutomation, Rahim had at least six investment advice businesses that involved either "calling out" his supposed trades or providing algorithms that directed investors what to trade. Each business had its own website, as depicted in Exhibit H. At least one of these websites was live between at least October 2021 through at least February 2025. PSR, ¶ 128; Ex. 3, ¶ 25. Again, Rahim made false claims by boasting high return rates and profits for ProChartSignals, OptionsCopier, CopyaAndWin, SnipeAlgo, and QQQTrade, all which Rahim owned and operated. PSR, ¶¶ 128, 130-132. Rahim also posted extensive spreadsheets of his supposed trades. *Id.* at ¶ 128. However, he was not posting his full trading history; specifically, he did not post his trades that lost money. *Id.* at ¶ 133. Records showed that he actually lost over $400,000 between 2021 and 2022. *Id.* at ¶¶ 134-135.

After his guilty plea, at least one of his websites, SnipeAlgo, was still operating and soliciting customers. Ex. 3, ¶ 25. But instead of asking for payment via credit card, the website noted "Yes, we can accept crypto. Call us." *Id.*; Ex. I. Additionally, in September 2024, Rahim posted on Craigslist, seeking an employee to work in customer service, to update "daily statistics on a website." Ex. 3, ¶ 26.

The defendant earned at least $1,397,978 in subscription fees from his investment advice businesses. Of note, during the scheme, credit card processor Stripe cut Rahim off from their service because of customer complaints disputing charges. PSR, ¶ 145; Ex. 3, ¶ 27. In response, Rahim opened another Stripe account using a friend's information to continue collecting fees. PSR, ¶ 109; Ex. 3, ¶ 27. This tactic concealed who was collecting the fees. Ex. 3, ¶ 27.

### *C. Rahim's Concurrent Public Corruption Crimes*

In 2019 and 2020, while Rahim's tax crimes were ongoing and a year before he began his investment fraud scheme, Rahim sought to corruptly influence the sheriff of Culpeper County,

Virginia, who was a publicly elected official. *Id.* at ¶ 181. On July 31, 2019, Rahim and Sheriff Scott Jenkins met and agreed that Rahim would become an auxiliary deputy and have his right to carry a firearm restored after his prior felony convictions in return for bribes to Sheriff Jenkins. *Id.* Thereafter, Rahim paid Sheriff Jenkins a total of $25,000 in cash and made in-kind donations to the sheriff's reelection campaign. *Id.* Rahim also made a $17,500 "loan" to Sheriff Jenkins and arranged for an associate to loan the sheriff another $17,500. *Id.* Sheriff Jenkins never repaid the purported "loan," and Rahim never requested repayment. *Id.*

In 2019, Sheriff Jenkins arranged for Rahim to purportedly lease a residence in Culpeper from one of Sheriff Jenkins's relatives. *Id.* On November 14, 2019, Sheriff Jenkins accompanied Rahim to file a petition in Culpeper County Circuit Court to have his firearm rights restored. *Id.* Rahim later appeared in the court on August 14, 2020, and falsely stated under oath that he was a resident of Culpeper. *Id.* After the court granted Rahim's petition and restored his rights, Rahim sought and received a concealed handgun permit. *Id.* On May 27, 2020, Rahim was sworn in as an auxiliary deputy for Culpeper and issued a badge and identification card. *Id.* On April 22, 2024, Rahim pled guilty to this conduct and is currently awaiting sentencing in the United States District Court for the Western District of Virginia.

## II. THE APPROPRIATE GUIDELINES RANGE

As this Court is aware, following the Supreme Court's decision in *United States v. Booker*, the Sentencing Guidelines are now advisory. 543 U.S. 220, 264 (2005). "In the wake of *Booker* . . . the discretion of sentencing court is no longer bound by the range prescribed by the guidelines. Nevertheless, a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005) (quoting *Booker,* 543 U.S. at 264). Both "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United*

*States*, 552 U.S. 38, 49 (2007). Therefore, "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005). This ensures that "sentencing courts are not left with unguided and unbounded sentencing discretion." *United States v. Green,* 436 F.3d 449, 455 (4th Cir. 2006).

***a. The Guidelines Calculation***

Probation has correctly calculated the Guidelines, PSR, ¶¶160-168, 208, as follows:

| | |
|---|---|
| **Base Offense** (U.S.S.G. §2B1.1(a)(1)) | 7 |
| Loss between $3,500,000 and $9,500,000 (U.S.S.G. §2B1.1(b)(1)(J) | +18 |
| Involved 10 or more victims (U.S.S.G. §2B1.1(b)(2)(A)(i)) | +2 |
| Sophisticated Means (U.S.S.G. §2B1.1(b)(10)(C)) | +2 |
| Obstruction of Justice (U.S.S.G. §3C1.3) | +3 |
| Acceptance of Responsibility (U.S.S.G. §§3E1.1(a)-(b)) | -3 |
| **Total Offense Level** | **29** |

An offense level of 29, with a criminal history category II, corresponds to a custodial sentence of 97 to 121 months. The defendant objects to his criminal history calculation, the sophisticated means enhancement, and the obstruction of justice enhancement (which related to him committing the investment fraud offense while on pre-trial release for both the Western District of Virginia case and the Eastern District of Virginia tax offense).

While the government does not object to the acceptance of responsibility finding, the government notes that it is a very close call. For one, the defendant failed to provide any of the requisite financial information until the last possible moment, specifically when objections were due for the third iteration of the PSR. The defendant did not provide the information in August of 2024 (for the tax only PSR) or in November 2024 (after he had pleaded guilty to the investment fraud conduct). Additionally, even after the defendant pleaded guilty, he still advertised SnipeAlgo for a fee. Ex. 3, ¶ 25; Ex. I. In September 2024, he posted "[s]imply call our office for payment option" and in January 2025, he wrote, "[y]es, we can accept crypto. Call us." *Id.* While the United States cannot prove whether Rahim has indeed accepted funds, there is a strong argument that he

is attempting to commit the very crime for which he pleaded guilty. One of the companies that he admits is generating value is "TeamRR," PSR, ¶ 204; this may correspond to TeamRickRahim. *See* Ex. H. It is against this backdrop that the United States argues for a low end of the Guidelines sentence.

***b. The Enhancement for Sophisticated Means Was Correctly Applied***

Rahim committed a longstanding investment fraud scheme, which cycled through various iterations, including a portion of which he conspired with others. The scheme should be viewed in its entirety and is clearly sophisticated.[4]

The Probation Officer correctly applied a two-level enhancement under § 2B1.1(b)(10)(C). Id. at ¶ 61. " 'Sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution **or** concealment of an offense… Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1 cmt. n. 9(B) (emphasis added). The plain language of the enhancement supports that a finding may be based on either the execution or the concealment of the offense. *United States v. Fowler*, 213 Fed.Appx. 788, *3 (11th Cir. 2007) (Sophisticated means enhancement supported by fraud involving multiple means of deception, including produced literature, fake clothing samples, using a marketing firm to solicit

[4] To the extent the Rahim is arguing that because he did not plead guilty to a count of conspiracy his coconspirators' conduct should be ignored, such argument fails. The Guidelines dictate that the court should take into consideration relevant conduct. Specifically, § 1B1.3(a)(1)(B) states that the court should take into account "jointly undertaken criminal activity a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." Indeed, the loss that the defendant agreed to include the subscription fees related to the conspiracy. And his coconspirators' acts that the government is relying upon are those that were reasonably foreseeable, as detailed in the SOFs and in Agent Thomas's Declaration. Specifically, the defendant admitted to knowing about his coconspirators acts and conduct. Additionally, even absent the relevant conduct principal, the defendant is also deemed to be convicted of additional offenses if the record contains stipulations that establish those offenses. U.S.S.G. § 1B1.2(c). Here, the SOFs clearly lay out the facts of the conspiracies both with UCC-A and Higgins. PSR, ¶¶ 76, 81-83, 99-126, 146.

investors, and claiming an attorney was suing Coca-Cola to justify missing income.) The Fourth Circuit has found that the "enhancement applies where the entirety of the scheme constitutes sophisticated means, even if every individual action is not sophisticated." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014) (bank fraud). The focus is on the execution of the scheme, which must separate the offense "from the ordinary or generic." *United States v. Jimwright*, 683 F.3d 471, 486 (4th Cir. 2012) (tax offense). For example, the *Adepoju* court noted that nearly all bank fraud schemes include misrepresentations and the use of another individual's information; as such, additional "complexities and intricacies" are required for the enhancement in a bank fraud scheme. 756 F.3d at 258. However, the clumsy execution of a scheme, should not be considered, instead the court should look to " 'especially complex or especially intricate' planning involved in the fraud." *United States v. White*, 850 F.3d 667, 676 (4th Cir. 2017) (tax fraud). In sum, the Fourth Circuit has required that the sentencing court "consider the cumulative impact of the criminal conduct, for the total scheme may be sophisticated when all the steps are linked together." *Jimwright*, 683 F.3d at 486 (internal citations omitted).

Of particular note, Judge Alston found the sophisticated means enhancement applied in the Higgins' case as to the FXP and TradeAutomation fraud conduct. Ex. 4, p. 11-14, Transcript of Higgins' Sentencing Hearing. While Rahim may not have been aware of Higgins' use of a European company, where the cryptocurrency was actually held, Rahim was clearly aware that FXP was offshore, and he knew the scheme required cryptocurrency. Ex. 3, ¶ 16-17; Ex. D, p. 2-3; Ex. E. Rahim touted that by the exchange being offshore there were <u>not</u> "know your customer" requirements, which resulted in there not being tax reporting. Ex. D, p. 2. He was in essence promoting the concealing nature of his own scheme. For one, the use of cryptocurrency made the traceability of funds much more difficult. In the run of the mill investment fraud schemes, defendants are paid by wire or check. Checks and wires could have been used to fund the bots

here, but instead the conspirators required cryptocurrency. As detailed in Special Agent Thomas' Declaration, the use of cryptocurrency, especially layered with the European company creating intermediary wallets (which was reasonably foreseeable given the facts), made tracing funds difficult. Ex. 3, ¶¶ 16, 30. In fact, because the funds were first required to be converted to cryptocurrency, which were then transferred, placed in an intermediary wallet offshore, is indeed very similar to how shell companies are used in financial crimes to conceal the scheme and the funds. The concealment nature alone justifies a sophisticated means enhancement.

But notwithstanding the use of cryptocurrency or the offshore nature of FXP, the execution of the TradeAutomation fraud also justifies the sophisticated means enhancement. Specifically, the use of trading bots (for which code had to be written), the fact that the FXP and TradeAutomation websites contained significant content, the use of Discord by Rahim, the intricate steps to even use the bots (first obtaining cryptocurrency, signing up for the TradeAutomation account, transferring the cryptocurrency to FXP, and then linking the TradeAutomation account to FXP using TA Manager), and the deleting of trades to keep losses hidden (so as to continue the fraud), when linked together justify the enhancement. Ex. J, p. 11-14; Ex. 3, ¶¶ 14, 16-18, 20-21; Ex. C to F; PSR, ¶ 146. And this only takes into account the TradeAutomation portion of the fraud.

Rahim cross advertised his investment platforms. When encouraging customers to invest using TradeAutomation, he referenced the fallacies of BotsforWealth. Ex. 3, ¶ 14; PSR, ¶ 113. He used Discord and social media to promote all his investment advice offerings. PSR, ¶¶ 95-98. His teamrickrahim.com website listed the website links to all of his other investment platform websites (ProChartSignals, OptionsCopier, CopyAndWin, SnipeAlgo, QQQTrade, and his lifetime memberships), which also had their own content. Ex. 3, ¶¶ 22-23; Ex. H; PSR, ¶¶ 128-133. Some of his victims paid for more than one of his investment advice programs. Ex. 3, ¶ 22. As such, the

court should not look at just one iteration of the scheme, but the entire scheme that he built.

Many of the same sophisticated means characteristics that were found in TradeAutomation also existed in BotsforWealth. Rahim knew that UCC-A and Company A were located offshore. Ex. A. Like TradeAutomation, BotsforWealth required that investors use cryptocurrency. *Id.* The use of cryptocurrency being sent to an offshore broker made the funds impossible to trace, so that a loss could not be calculated; thus, concealing the fraud. Ex. 3, ¶¶ 22, 29. This wasn't the only concealing nature in the scheme, Rahim created a fake "victim worksheet," which he claimed would assist law enforcement and his civil lawsuit. Both the fake "victim worksheet" and the lawsuit, were meant to conceal the fraudulent nature of the scheme, and Rahim's own culpability, from his victims. *Id.* at ¶ 12; Ex. B. The sophisticated means enhancement is also based upon the intricacies in the execution of the scheme, including the creation of videos, use of social media to market the scheme, the use of bots (for which code was required), all of the websites created to backstop the fraud, as well as the lawsuit and fake "victim worksheet." As such, the BotsforWealth portion of the scheme by itself would also justify the enhancement.

And then there are the six additional investment advice platforms (ProChartSignals, OptionsCopier, CopyAndWin, SnipeAlgo, QQQTrade, and his lifetime memberships) that Rahim used in his scheme. These were built on Rahim's common scheme of creating significant video content, Discord postings, and websites with profit statistics. Exhibit I and Exhibit C gives a more in-depth view to how these sites looked and what was provided. Some of these advice platforms also used computer algorithms to declare what trades should be made. Even if Rahim didn't write the code, it added to the sophistication of the scheme. And underlying the entire fraud, was the deception used by Rahim when he deleted Discord postings that were negative and created at least 20 fake Discord profiles to create the illusion of community involvement. And finally, at one point during the scheme, due to customer complaints, Rahim opened a Stripe account using a friend's

name; thus, concealing his collection of fees. Ex. 3, ¶ 27. Taken altogether, the investment fraud is clearly deserving of the sophisticated means enhancement. This was an especially complex fraud, with intricate planning and execution; when considering the cumulative impact, the total scheme is sophisticated when all of the steps are linked together.

### *c. The Enhancement for Commission of an Offense While on Release Was Correctly Applied*

Rahim objects to the application of a three-level enhancement, pursuant to U.S.S.G. § 3C1.3, for committing an offense while on release. In his objections, Rahim admits that "the statement of facts underlying his conviction for wire fraud contains admissions about *conduct* committed while Mr. Rahim was on pretrial release," PSR, p. 49 (emphasis in original), but argues that this does not amount to a conviction for which the application of a three-level enhancement, pursuant to § 3C1.3, applies. However, the Guidelines clearly indicate that "[a] plea agreement (written or made orally on the record) containing a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant had been *convicted* of additional count(s) charging those offense(s)." U.S.S.G. § 1B1.2(c) (emphasis added). In his signed Statement of Facts, Rahim admitted:

> "Likewise, SnipeAlgo and QQQTrade both claimed to offer "genius" artificial intelligence ("AI") algorithms. SnipeAlgo was launch[ed] *in and around June 2023* and QQQTrade *in and around January 2024*. SnipeAlgo and QQQTrade recommended QQQ option trades…"
>
> "Statements posted on CopyandWin, OptionsCopier, ProChartSignals, SnipeAlgo, and QQQTrade were false. RAHIM was not personally trading millions of dollars as his websites stated nor did he have the success or earn the profit margins that he claimed on the websites."

PSR ¶¶ 132-33 (emphasis added).

Additionally, between June 2023 and February 2024, Rahim accepted approximately $116,000 in subscription fees for his fraud. Ex. 3, ¶ 28. Further, at least one of his websites, SnipeAlgo, sought fees from customers until January 2025. *Id.* at ¶ 25, 28. Both of these facts

justify the enhancement.

Rahim has admitted to conduct that, for purposes of his sentencing, is treated as if he were convicted of an investment fraud scheme, which occurred up through at least February 2024 (and arguably after he pled guilty in August 2024 as he continued to seek fees into January 2025), when Rahim was on pretrial release on tax charges in this district (Case No. 1:23-cr-173) and on public corruption charges in the Western District of Virginia (W.D. Va. Case No. 3:23-cr-11). The three-level enhancement for committing an offense while on release thus applies.

***d. Rahim's Criminal History was Correctly Calculated***

Rahim has lodged a two-fold objection to the application of a criminal history point for his 2009 sentence for unlawful assembly. PSR, p. 52. First, Rahim argues that he should not receive a criminal history point for his 2009 sentence because it occurred more than 10 years before the commencement of the instant offense. To reach this conclusion, he argues that the determination of criminal history is determined only *after* the application of the grouping rules, so the sentencing court must consider only the prior sentences that occurred within 10 years of Rahim's fraud conduct. However, the section of the Guidelines that provides instructions for computing criminal history defines the phrase "commencement of the instant offense" to include any relevant conduct. U.S.S.G. § 4A1.2 comment. (n. 8). Likewise, the general application instructions define the term "offense" as the "offense of conviction *and all relevant conduct* under § 1B1.3 unless a different meaning is specified or otherwise clear from the context." U.S.S.G. § 1B1.1 comment. (n.1(I)) (emphasis added).

Pursuant to U.S.S.G. § 1B1.3(a)(2), relevant conduct includes "all acts and omissions … that were part of the same course of conduct or common scheme or plan as the offense of conviction." Rahim pled guilty to willfully failing to account for and pay over trust fund taxes for the third quarter of 2020; however relevant conduct includes his earlier tax crimes – including, his

evasion of his income taxes since 2012 (PSR, ¶ 51), his willful failure to account for and pay over trust fund taxes in 2015 (*id.* at ¶ 60), and his failure to file tax returns since 2012 (*id.* at ¶ 62)– is relevant conduct for that offense. As such, the 2009 sentence occurred within 10 years of commencement of the instant offense which date back to 2012 and 2015.

Second, Rahim argues that his sentence for unlawful assembly should not receive a criminal history point because it is similar to disorderly conduct or disturbing the peace. *Id.* at p. 52. The Guidelines instruct the sentencing court not to count sentences for a list of crimes or "offenses similar to them, by whatever name they are known" unless "(A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense." U.S.S.G. § 4A1.2(c)(1). Among the crimes listed is disorderly conduct or disturbing the peace. In assessing what constitutes a similar offense, the Guidelines commentary instructs courts to "use a common sense approach" and to consider:

> "relevant factors such as (i) a comparison of punishments imposed for the listed and unlisted offenses; (ii) the perceived seriousness of the offense as indicated by the level of punishment; (iii) the elements of the offense; (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct."

U.S.S.G. § 4A1.2, comment. (n.12(A)); *see also United States v. Hines*, 628 F.3d 101, 110 (3d Cir. 2010) (recognizing that the Guidelines now prefer the Fifth Circuit multi-factor approach from *United States v. Hardeman*, 933 F.2d 278 (5th Cir. 1991) over the elements test previously used by the Fourth and Third Circuits, among others).

Both common sense and the above factors weigh in favor of a finding that Rahim's sentence for unlawful assembly is not similar to disorderly conduct or disturbing the peace. Under Virginia law, unlawful assembly and disorderly conduct are Class 1 misdemeanors punishable by up to a year in prison. *See* Va. Code §§ 18.2-406 and 18.2-415. Although both offenses are classified as "Crimes Against Peace and Order," unlawful assembly is grouped with other crimes

under the subcategory "Riot and Unlawful Assembly," while disorderly conduct constitutes its own separate subcategory. If the defendant carried a firearm during his participation in unlawful assembly, then he is guilty of a felony. *See* Va. Code § 18.2-406. By contrast, disorderly conduct contains no similar provision. *See* Va. Code § 18.2-415; *see also United States v. Ubiera*, 486 F.3d 71, 75 (2d Cir. 2007) (comparing relative punishment under two statutes that is based on sentences for repeat offenders). This is especially pertinent given that Rahim was charged with possession of a firearm in connection with his arrest on this offense. *See* Shapira, Ian, "Fairfax Poker Game is Raided," *The Washington Post* (Dec. 22, 2005), available at https://wapo.st/3PHOngk.

Rahim received a 12-month suspended sentence for his unlawful assembly, which should be considered comparably serious as it is one day short of automatically counting as a criminal history point. Under Virginia law, this is akin to 12 months of unsupervised probation. *See* Va. Code § 19-2-306 ("[I]n any case in which the court has suspended the execution or imposition of sentence, the court may revoke the suspension of sentence for any cause the court deems sufficient that occurred at any time within the probation period, or within the period of suspension fixed by the court."); *see also United States v. Brown*, 909 F.3d 698, 700-701 (4th Cir. 2018) (holding that "a suspended sentence in Virginia conditioned on a period of good behavior is a criminal justice sentence" for Guidelines purposes); *Collins v. Commonwealth of Virginia,* 269 Va. 141, 146 (2005) (the "condition of good behavior is implicit in every order suspending sentence, is a condition of every such suspension, whether probation is provided for or not, and applies whether expressly so stated or not"). Under U.S.S.G. § 4A1.2(c)(1)(A), a term of probation of more than one year would automatically count toward Rahim's criminal history, without regard to whether the prior offense was similar to one of the listed offenses. The sentence Rahim received for unlawful assembly is merely *a single day* shy of a year, which would have resulted in it being automatically counted toward Rahim's criminal history. As such, the Court should treat Rahim's

sentence as comparably serious.

A comparison of the elements of the unlawful assembly and disorderly conduct reinforces the conclusion that they are dissimilar. Under Virginia law, unlawful assembly requires: (1) three or more persons assembled; (2) with the intent to advance some lawful or unlawful purpose by the commission of act(s) of unlawful force or violence likely to seriously jeopardize public safety, peace, or order; and (3) the assembly actually tends to inspire reasonable individuals with well-grounded fear of serious and immediate breaches of public safety, peace, or order. *See* Va. Code § 18.2-406. By contrast, whether defined under federal law or Virginia law, disorderly conduct is conduct undertaken "with the intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof." Va. Code § 18.2-415; *see United States v. Elmore*, 108 F.3d 23, 25 (3d Cir. 1997); *see also United States v. Tigney*, 367 F.3d 200, 202 (4th Cir. 2004) (instructing sentencing courts to "look to federal law to determine the elements of the *listed* offense, as for the ultimate determination of whether the two offenses are 'similar'" (emphasis in original)). As such, the offense of unlawful assembly contains elements not present in the offense of disorderly conduct that distinguish unlawful assembly and make it more serious, namely: the assembly of three or more people (hence why the statute is classed with statutes aimed at riots); the intent to create a *serious* threat to public safety, peace, or order; and the *actual* fear of such a threat.

The level of Rahim's culpability likewise supports a conclusion that the offenses are dissimilar. As public reporting and the docket confirm, Rahim was initially charged with a felony for operating an illegal gambling operation and for being a felon in possession of a firearm. *See* Shapira, Ian, "Fairfax Poker game is Raided," *The Washington Post* (Dec. 22, 2005), available at https://wapo.st/3PHOngk. The former charge was ultimately pled down to unlawful assembly and the latter was nolle prossed. Therefore, contrary to Rahim's assertion that his culpability was "minor," he, in fact, seems to have had a high level of culpability for the offense. He was arrested

with a firearm, which could have made his unlawful assembly a felony, *see* Va. Code § 18.2-406, and was the *operator* of the gambling ring. *Compare* Va. Code § 18.2-328 (subjecting the operator of an illegal gambling operation to a felony) *with* Va. Code § 18.2-328 (subjecting anyone else who aids or assts in a gambling operation to a misdemeanor).

Finally, Rahim's sentence for unlawful assembly indicates a likelihood of recurring criminal conduct. The conduct underlying Rahim's unlawful assembly conviction was born from his leadership in a gambling operation. As noted in the statement of facts accompanying Rahim's plea to public corruption offenses in the Western District of Virginia, Rahim met one of his co-conspirators in that case, Fred Gumbinner, through a poker game in spring of 2019. *See* W.D. Va. Case No. 3:23-11, Dkt. No. 119 at 3. Thus, Rahim's propensity to engage in gambling has already directly contributed to his participation in at least one other crime and very well could contribute to others in a similar fashion. Moreover, when Rahim was arrested, he was charged with being a felon in possession of a firearm. Ultimately, Rahim bribed the Culpeper County Sheriff to have his right to carry a firearm restored. In this way, Rahim's arrest on the offense appears to have spurred his further criminal conduct. Based on Rahim's conduct underlying the unlawful assembly conviction, the legal elements supporting the conviction, and the fact that Rahim's sentence falls within 10 years of the commencement of the instant tax offense, the criminal history point appropriately applies.

## III. CONSIDERATION OF § 3553(A) FACTORS & RECOMMENDED SENTENCE

After calculating the appropriate guidelines range, "the court must 'determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006) (cleaned up). Those factors include the nature of the offenses, the characteristics of the defendant, and the need for the sentence to reflect the seriousness of the

offense, afford deterrence, protect the public, and provide the defendant with needed educational or other training. 18 U.S.C. § 3553(a). The Court need not weigh the factors equally but must consider each of them. *United States v. Fowler,* 948 F.3d 663, 674 (4th Cir. 2020).

Rahim's crimes necessitate a meaningful term of imprisonment to adequately account for the seriousness of his offenses, to deter him from further crimes, and to promote respect for the law, especially in light of the Sentencing Commission's explicit direction that sentences for tax offenders must serve to deter others from violating the nation's tax laws.

The Guidelines range being used is conservative in nature. Foremost, it does not include the underlying investment losses related to BotsforWealth (the loss couldn't be determined) or to TradeAutomation (a portion of the loss was due to Higgins' theft). Additionally, the United States did not take a position as to the consolidation of his sentencing hearing. If the tax fraud and investment fraud cases had not been consolidated for sentencing, Rahim would be facing an additional conviction that would have impacted his criminal history, and he would not be getting the benefit of grouping his convictions. And finally, the Government did not object to him receiving a reduction for acceptance of responsibility, which had a three-point impact.

***a. A Low-End Guidelines Sentence Reflects the Nature and Circumstances of the Offense, the Seriousness of Rahim's Offense, and Provides Just Punishment***

Rahim is a serious offender with a demonstrated propensity to recidivate. His crimes span more than a decade and encompass all sorts of schemes, each of which shared a common end: serving Rahim's self-interest at the expense of the public.

Rahim's current offenses began more than a decade ago when he began cheating the IRS for his own gain. His scheme to cheat the IRS actually encompassed three separate types of tax crimes: (1) evading payment of his income tax obligations by, among other things, lying to the IRS and moving assets out of reach; (2) willfully failing to file income tax returns between 2012

and 2022 despite earning *tens of millions*; and (3) willfully failing to pay the IRS money he had withheld from his employees' paychecks and refusing to file employment tax returns. The last was a crime that Rahim committed *every single pay period* when he withheld money from his employees' paychecks but deliberately chose not to pay the IRS for *six straight years*. Instead, Rahim spent the money he took from the public coffers to pay for expensive luxuries, such as three Lamborghinis and three different homes. *See* PSR, ¶¶ 33, 60.

The Court should not be confused: just because the harm caused by Rahim's tax crimes is diffuse does not mean it is any less real. The loss to the IRS was substantial, conservatively amounting to *at least* $4,488,766. *Id.* at ¶ 150. For just one individual this is a significant amount of harm, as a means of reference such an amount could fund such things as yearly Medicaid benefits for approximately 492 recipients;[5] yearly Supplemental Nutrition Assistance Program (SNAP) benefits to 1,765 families;[6] or countless other programs and services critical to Americans.

In 2021, towards the end of Rahim's decade-long scheme to cheat the IRS, he began engaging in even more brazen and direct efforts to cheat the public directly through his fraudulent investment advice scheme. This fraud scheme has gone through various iterations but has kept a common theme—collect subscription fees by offering investment advice (through various means) that touted incredible rates of returns. PSR, ¶¶ 103, 116, 128, 130-132. The initial iteration involved offering bots, along with UCC-A, through Rahim's company BotsforWealth. Despite investors losing significant funds, he was committed to his fraud. He found a new company to

---

[5] *See* https://www.medicaid.gov/state-overviews/scorecard/measure/Medicaid-Per-Capita-Expenditures?measure=EX.5&measureView=state&stratification=463&dataView=pointInTime&chart=map (last visited Jan. 24, 2025) (listing $9,108 for total median per capita expenditures for Medicaid in 2022, the most recent available data).

[6] *See* https://www.ers.usda.gov/topics/food-nutrition-assistance/supplemental-nutrition-assistance-program-snap/key-statistics-and-research#:~:text=In%20FY%202023%2C%20SNAP%20served,%24211.93%20per%20participant%20per%20month (last visited Jan. 24, 2025) (listing average SNAP benefit as $211.93 per participant per month in 2023, the most recent available data).

partner with, FXP, and he continued his fraud scheme. Rahim swore that the new bots were owned by him and had significant back testing—neither were true. But Rahim did not offer only bots, he also had six other advice platforms, including his lifetime membership program, which offered various mechanisms for investors to copy his trading recommendations. By continuing his fraudulent conduct, Rahim lined his pockets with at least $1,308,141.

The manner of Rahim's deception is also important. He used multiple websites, with detailed FAQ pages and details on returns, posted on Discord, and posted numerous videos on social media. *Id.* at ¶¶ 94-95, 99; Ex. 3; Ex. A, C to I. He sent out an email to the BotsforWealth victims not only blaming UCC-A, but he also tried to calm his investors' fears by pointing to his lawsuit and sending them a "Victim Worksheet" to fill out. Ex. B. Indeed, several victims also included them in their victim impact statements. PSR, p. 75, 100, 260. Such longstanding sophisticated and relentless schemes justifies a Guidelines sentence.

There were thousands of victims in this investment fraud case. And they were harmed. Some noted the need for counseling, them loosing trust with their family members, and them being ashamed. Rahim wreaked havoc on his victims and that deserves a serious period of incarceration.

At the same time that Rahim was committing tax and investment fraud, he was also bribing the publicly elected sheriff of Culpeper so that, as a convicted felon, he could have his gun rights restored, and become a badge-carrying auxiliary deputy, who could nationwide conceal carry. Rahim's willingness to bribe an elected official for his own ends exhibits a blatant disdain for the principles of good government and fair play. It also aptly distills the corrosive nature of Rahim's crimes, each of which strike at public faith in the system: his tax crimes at the belief that we should all pay our fair share, his investment fraud at the presumption of honest dealing, and his bribery at the notion that elected office is a public trust for the common good and not a private benefit for those willing to pay for favors.

Rahim's contempt of the tax laws spans since at least 2012. *Id.* at ¶ 39. Similarly, he committed a long-standing investment fraud through various iterations. He did not stop when the BotsforWealth bots failed causing significant harm, he did not stop when TradeAutomation failed, and he did not stop even when the FBI made him aware of their investigation in February of 2023. The sheer number and breadth of Rahim's recent crimes speak volumes about his contempt for the law. So, too, does the fact that he has continued to commit crimes even while he was on pretrial release in two separate cases and under explicit Court direction not to commit additional crimes. He simply does not believe the law applies to him.

***b. Rahim's History and Characteristics Support a Low-End Guidelines Sentence***

In fact, Rahim has a history of fraudulent conduct throughout his life. However, unlike other defendants who are impoverished or suffering the emotional scars of an abusive home, Rahim has lived a comfortable life amassing significant wealth, with a net worth of at least $3.5 million, both as detailed during the investigation and by his own admission to Probation.[7] PSR, ¶ 51. He has driven a Bentley, three different Lamborghinis, a Mercedes, Teslas, and Cadillacs. *Id.* at ¶¶ 51, 206. He owned a helicopter, a $1.6 million beach home in the Outer Banks of North Carolina, and two luxury homes in Great Falls, Virginia (one worth $3.4 million[8] and the other worth $1.6 million). *Id.* And, significantly, he used his wealth to promote his image and attract investors to his schemes. *Id.* at ¶ 98. As such, his offenses are quintessentially crimes of choice and greed; his decisions to cheat on his taxes and defraud investors appear born both of an unremitting greed and an unwillingness to accept that the rules applied to him.

---

[7] During his second status hearing to obtain counsel in front of Judge Valla, the court noted that she would appoint him counsel based on the non-liquid assets, but if he was found to be able to afford an attorney, he could be directed to pay for his court appointed counsel. As such, the court is paying for his representation. To this day, he is admitting to earning at least $20,000 a month. PSR, ¶ 204.

[8] This home has 8 bedrooms, 10 bathrooms, and sits on 6.68 acres. PSR, ¶ 195.

By Rahim's own admissions, he had a loving and supportive upbringing. *Id.* at ¶ 198. He was raised in a safe middle class neighborhood by his father, a college professor, and his mother, an elementary school teacher. *Id.* However, despite his positive upbringing, Rahim's criminal acts date back to 1987. *Id.* at ¶¶ 173-74. From 1987 to 1992, for which he received no criminal history points, Rahim engaged in various frauds and was convicted of theft, obtaining money on false pretenses and forgery, conspiracy to commit grand larceny, and obtaining property under false pretenses. *Id.* at ¶¶ 174-75, 177-78. He has no respect for the law and has never served a serious period of incarceration. As such, a low-end of the Guidelines sentence is justified.

Rahim's history and experience also evince a strong knack for business. *See*, *e.g.*, *id.* at ¶¶ 30-31. His success in both the business world, and his fraud is in part due to his "influence and charisma" which he used "to manipulate people" as explained by one victim. *Id.* at p. 84. However, rather than use his professional experience, savviness and knowledge to earn lawful income and comply with his tax obligations, he has used it to commit fraud and evade the IRS. As such, he should be punished with a Guidelines sentence.

***c. A Low-End Guidelines Sentence Avoids Unwarranted Sentencing Disparity***

The defense will likely point to other tax cases, and even Ian Higgins' sentence of 36 months, PSR, ¶ 27, at as to why Rahim is deserving of lower than a Guidelines sentence. But generally, these cases are simply not comparable. The defendant committed a significant number of crimes (three types of tax fraud, six iterations of the investment fraud scheme, and bribing of a public official). Additionally, Higgins admitted to his guilt early on, well before a potential indictment, and stated his inclination to plead guilty upon the search of his phone in February 2023. He also sold his $2 million home and gave the funds to the government to pay down his forfeiture. The defendant took quite a different path. He pled guilty months after the tax indictment, and nearly 18 months after law enforcement seized his phone in the investment fraud case. The

defendant failed to provide financial information for his PSR until the last possible moment. And he sought payment from victims for SnipeAlgo as recently as January 2025. The circumstances and facts surrounding his crimes justify a low-end of the Guidelines sentence and account for a disparity of a sentence from Higgins.

#### ***d. A Low-End Guidelines Sentence Will Promote Respect for the Law and Afford Adequate Deterrence to Others Considering Tax or Fraud Crimes***

A low-end Guidelines sentence is necessary to deter others, who may be tempted to commit fraud and tax offenses like Rahim's for their own enrichment. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (cleaned up); *see also United States v. Howard*, 28 F.4th 180, 209 (11th Cir. 2022) ("General deterrence is more apt, not less apt, in white collar crime cases."); *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2012) ("[G]eneral deterrence is an important factor in white-collar cases, where the motivation is greed.").

This is especially true for tax offenses, which are inherently difficult to detect and prosecute. Data from the United States Sentencing Commission bears this out; from 2015 through 2023, there were only 488 tax cases prosecuted in the entire Fourth Circuit and only 103 tax cases were prosecuted in this district – an average of between eleven and twelve a year.[9] The Sentencing Commission in its Introductory Commentary to Chapter 2, Part T, has explicitly stressed:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying the Sentencing Guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to

[9] *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed January 23, 2025).

would-be violators.

This principle is something that the Fourth Circuit has incisively explained and endorsed in overturning a tax offender's sentence of probation:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010). The nation's tax system relies on the voluntary compliance of individual taxpayers to file accurate tax returns and pay their taxes. The integrity of that system is threatened when taxpayers lose confidence that those who cheat – like Rahim – will be caught and punished.

The fraud victims have also pointed to the need for deterrence in this case. One victim explained that "an example" needs to be made, in order to "educate and protect consumers, [and] discourage others from doing the same." PSR, p. 72. Another victim stated, "it is crucial that justice is served, not only to hold him accountable for his actions but also to deter others from exploiting the trust of innocent people in the future." *Id.* at p. 84. In sum, as explained by another victim, "[j]ustice must be served to deter future instances of digital exploitation and restore trust in our online interactions." *Id.* at p. 91.

A Guidelines range sentence for Rahim sends the appropriate message that fraud and tax offenses – especially egregious frauds like Rahim's – are serious and will result in a meaningful term of incarceration. Conversely, a sentence without meaningful incarceration will undermine deterrent efforts and send the wrong message: that fraudsters and tax cheats do not go to jail.

***e. A Meaningful Sentence at the Low End of Guidelines is Necessary to Specifically Deter the Defendant as well as to Protect the Public from Further Crimes of the Defendant.***

The defendant must be specifically deterred and the public needs to be protected. It is clear

that absent being locked up, he will commit crimes. IRS searched his business in March of 2022. Rahim was already committing his investment fraud scheme and continued to do so knowing IRS was investigating his financials. FBI seized his phone in February 2023. And he continued his investment fraud. Rahim was indicted in the Western District of Virginia in June 2023 for bribing a Sherriff so that he could have nationwide conceal carry. Yet, he continued to defraud individuals through his investment fraud scheme. In October 2023, he was indicted for tax fraud. And again, he continued his investment fraud scheme. In August 2024, he pleaded guilty in the investment fraud case. Not deterred, he kept his websites active, sought an employee, and told potential customers to call his office to pay in cryptocurrency. A meaningful sentence of incarceration is necessary to deter the defendant from committing future crimes and to protect the public. Indeed, Rahim must learn that actions have consequences, so that he will think twice before ever offending again and consider the harm he is causing to others.

## IV. CONCLUSION

The United States respectfully requests this Court impose a low-end Guidelines sentence of incarceration, three years of supervised release, restitution and forfeiture (which the parties plan to confer and agree upon). The United States submits that this sentence is sufficient, but not greater than necessary, to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Erik S. Siebert
United States Attorney

By: /s/ Kimberly M. Shartar
Kimberly M. Shartar
Assistant United States Attorney

Date: February 28, 2025

William M. Montague
Ashley J. Stein
Trial Attorneys
U.S. Department of Justice, Tax Division

## CERTIFICATE OF SERVICE

I hereby certify that on **February 28, 2025**, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Kimberly M. Shartar
Kimberly M. Shartar
Assistant United States Attorney