UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

---------------------------------x

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action No.: 1:24-cr-26 |
| v. | |
| IAN TAYLOR HIGGINS, | August 28, 2024 |
| Defendant. | |

---------------------------------x

# TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,
UNITED STATES DISTRICT COURT JUDGE

## A P P E A R A N C E S

FOR THE GOVERNMENT: KIMBERLY M. SHARTAR, DOJ-USAO
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314

FOR THE DEFENDANT: JESSICA A. RICHARDSON, ESQ.
Patrick N. Anderson and Associates PC
333 N. Fairfax St
Suite 310
Alexandria, VA 22314

OFFICIAL U.S. COURT REPORTER: MS. TONIA M. HARRIS, RPR
United States District Court
401 Courthouse Square
Tenth Floor
Alexandria, VA 22314

**P R O C E E D I N G S**

(Court proceedings commenced at 11:37 a.m.)

THE COURTROOM CLERK: Criminal No. 2024-26. United States of America versus Ian Taylor Higgins.

Counsel, please note your appearances for the record.

THE COURT: Good morning.

MS. SHARTAR: Good morning, Your Honor. Kimberly Shartar for the United States.

THE COURT: Good morning, ma'am.

MS. RICHARDSON: Good morning, Your Honor. Jessica Richardson on behalf of Mr. Higgins.

THE COURT: Good morning, ma'am. Mr. Higgins is also present.

THE DEFENDANT: Yes, sir.

THE COURT: Very good. This matter comes on today for sentencing.

MS. RICHARDSON: Would Your Honor allow me a moment to discuss this?

THE COURT: Sure. Absolutely.

(Counsel and Defendant confers.)

THE COURT: Counsel, give us a moment. Does your client need a moment, Ms. Richardson?

MS. RICHARDSON: Yes, Your Honor.

(A pause in the proceedings.)

MS. RICHARDSON: Thank you, Judge.

THE COURT: Yes, ma'am. This matter comes on today for a sentencing. Are there any corrections, deletions, or modifications to the presentence report prepared in this matter?

MS. RICHARDSON: Your Honor, I would just submit that I have filed an objection to sophisticated means but everything else we're good to go on.

THE COURT: And I understand your point, and what we'll do, I think is the best way to handle this, is we'll deal with the legal argument first. And since you're the proponent of the motion you can go ahead and go first and then I'll hear from the Government.

MS. RICHARDSON: Thank you, Your Honor. The sophisticated means argument at this time?

THE COURT: Yes, ma'am.

MS. RICHARDSON: Your Honor, I would object to the sophisticated means enhancement which is a two-level enhancement. As I stated in my presentence report objection, this enhancement is directed towards defendants that intentionally make fraud schemes difficult to uncover and detect. Specifically, Your Honor, it stems from a need to acknowledge that a defendant plans extensively and applies a higher level of skill to put the scheme into action.

THE COURT: Wouldn't you agree with me, Counsel, that the scheme that your client developed was pretty ingenious? It was not something that I've heard before. I'm sure other people have done it, but it's not something that I've heard before and did indeed require a large degree of ingenuity to pull it off.

MS. RICHARDSON: Your Honor, I don't agree that it wasn't a scheme that involved some ingenuity, but at the same time I would argue I don't think sophisticated means is applicable to that. Simply because the scheme that was developed there's going to be an inherent concealment in any scheme, Your Honor.

THE COURT: Sure.

MS. RICHARDSON: So I believe the government in its filing and myself, we both reference the case of *United States v. Adepoju*, which is a United States Court of Appeals case for the Fourth Circuit from 2014. And in that case the language that the Court used was, quote, Sophistication requires more than the concealment or the complexities that are already inherent and fraud. Thus, fraud per se is inadequate for demonstrating the complexity required for the enhancement. And in that case the Court was addressing a bank fraud situation, so a little bit different.

THE COURT: And I agree that the Fourth Circuit has spoken on it, but I believe that there are two other circuits,

specifically the second and a district court, that had a more, shall we say, applicable analysis of this type of fraud and then came to the conclusion that the sophistication issue was met by the government.

MS. RICHARDSON: And again, Your Honor, I would argue that this is a little bit different. This is kind of a niche situation where it's involving an investor scheme, Your Honor. It's a little bit different than just your typical wire fraud or your typical bank fraud. And I know that the government maintains that use of cryptocurrency made the traceability of the funds more difficult, and that because the funds were first required to be converted to cryptocurrency, which were then transferred to an intermediary wallet and then held in a pool account -- a pooled account that was a European company -- that that lends evidence to an argument that sophisticated means were used.

Your Honor, I don't agree with that. I think that what might have been considered sophisticated many years ago is not necessarily sophisticated today. And as I referenced in my objection, I think that the pandemic in general, Your Honor, shifted and increased the amount of corporate work that involved various software platforms, different aspects of technology to be done remotely and used more frequently. So I think that people have become much more familiar with more advanced programs, technology has drastically transformed the

ways in which we conduct our commercial and our personal business. More laypeople understand it today than they did years ago. So I don't think the use of cryptocurrency lends any evidence towards sophisticated means because every single day the use of cryptocurrency becomes more common. Just because it can be transferred from wallet to wallet or place to place doesn't make it different from regular currency, which could also be transferred from place to place in an effort as they say to quote/unquote wash dirty money.

Your Honor, it does not become sophisticated simply because the method of payment is cryptocurrency. And additionally, just because Mr. Higgins incorporated FXP in St. Vincent and the Grenadines, it's not an effort to conceal fraud. It's an online trading platform, Your Honor. It's open to the public, it's accessible --

THE COURT: Wouldn't you agree that by setting up the business, for lack of a better way of putting it, in a foreign country or a foreign territory that does not have the same protections as would exist in the United States, would suggest that he was proceeding in a way that to more particularly hide his fraud?

MS. RICHARDSON: Your Honor, I don't disagree that things were done in an effort to conceal. What my argument is is that there is an attempt to conceal inherent in the nature of fraud. No matter what kind of fraud that you commit, Your

Honor, the goal is always to hide it, you know, to avoid the authorities. I don't think just because it's registered there, given the fact that it's an online trading platform accessible to anybody -- and, Your Honor, obviously, advertising it as if it were regulated by the SEC in the Bahamas is clearly misleading to the investors, but I don't think that it rises to the level of sophisticated means.

The government also mentions in its paper that the fact that there were automatic bots being used lends evidence towards sophistication. Your Honor, though the world of investments and trading, again, is a very kind of niche area, bots are very commonly used when trading online, and those familiar with investing, those familiar with trading foreign exchange in a lawful manner, Your Honor, use them commonly. So I would just argue that I don't think it reaches the level of sophisticated means.

THE COURT: Thank you, Counsel.

MS. RICHARDSON: Thank you, Judge.

MS. SHARTAR: Your Honor, the issue here isn't just the cryptocurrency, just the registering overseas, just the use of bots. It's every single step linked together along with additional items. The fact that there were three different websites that had to be created. We gave you Special Agent Thomas's declaration some screenshots of those pages to give you an idea of the complexity behind this. So

this is not a situation where it was just an ad posted. It was three different websites that had to be created with specific steps that had to be followed.

While the use of cryptocurrency alone might not support a sophisticated means, and while it has become more mainstream, it was not mainstream here. And the government attempted to explain the difficulty in tracing funds, and I think a more apt analogy would be each crypto wallet is akin to a bank account. So here, because there were over 1800 wallets, that would be the equivalent of 1800 bank accounts. That is incredibly complex, that's incredibly difficult to trace funds.

And counter to what the defense has shared I don't think there's any evidence that bots are actually mainstream. While they might be used at high level --

THE COURT: I think in the SEC world that we live in today bots have become basically the template for engaging in all kinds of transactions.

MS. SHARTAR: In transactions, but they are also being used in fraud. And this is not an individual who is involved in a legitimate trading platform. I mean he's bought code off the internet and tinkered with it, and that requires sophistication as well. Not every American can set up a company overseas, can mess with code for a bot, can transfer money in and out of crypto, set up three different websites.

THE COURT: Do you know, and this might be a difficult question, you might not know the answer, so don't concern yourself if you don't.

Was there any particular ingenuity necessary to set up the bots?

MS. SHARTAR: My understanding -- the government still does not know to this day if the bots were actually trading and where all the money actually went. What we understand was code was purchased off the internet, and that he edited it and that is in the statement of facts. So that does require some ingenuity. Not everybody in mainstream America knows how to code, period.

So I think, really the point here, and we've touched a little bit on the use of offshore entities. It wasn't just one offshore entity, Your Honor. It was also picking a platform in Poland to hold the funds. The money could have been held here in the U.S., and then to trade in Forex to then pick another foreign company. There's case law that says, A clumsy execution by which -- a clumsy execution does not make a case not sophisticated. And here the United States, fortunately, there was somebody in the United States that could be subpoenaed. And so that really did open the door because otherwise this would have been successful in the concealment.

And so, I think the most important point is a quote

from one of the cases. It's the cumulative impact of the conduct when all the steps are linked together, and that's what we have here, Your Honor. It's not just one item. It's setting up multiple websites. It's having -- have a web designer from what we believe was Russia. It's the use of the algorithm. It's having data, specific data, posted on websites. It's running the algorithm to come up with the various profit margins. It's everything together that makes this a sophisticated scheme. Thank you.

THE COURT: Thank you. Do you want to close your argument, Ms. Richardson?

MS. RICHARDSON: Your Honor, just briefly. I think I've made my point. I don't disagree that frauds were transferred from place to place to place in an effort to conceal them. Your Honor, there's no doubt that it was a large fraud. It's difficult to trace any large fraud. But I don't think the size of the fraud is indicative of sophisticated means.

And then as far as the code is concerned, again, Your Honor, it's a very niche type of investment platform. I think simply using code to create a bot because you have the education and you know how to make a code does not necessarily mean that you're using sophisticated means. Not everyone trades with bots, obviously, but a lot of people in this area do. And, of course, Your Honor -- of course not everyone

knows how to create a bot. Most people invest. So I think it rises to the level of a very large fraud in a scheme, but I don't believe it rises to the level of sophisticated means.

THE COURT: I appreciate the arguments of both counsel.

Obviously, this is an issue that's been taken up by the Fourth Circuit and by several circuits deciding what the particular provision actually means. And this is the Court's view of the matter:

Higgins, Rahim, and their coconspirators ran a sophisticated investment fraud scheme. The probation officer correctly applied a two-level enhancement under code. Sophisticated means, means complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conducts such as hiding assets or transactions or both through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicate sophisticated means.

As indicated earlier, the Fourth Circuit has found that the enhancement applies where the entirety of this scheme constitutes sophisticated means even if every individual action is not sophisticated, and that's the *Adepoju* case, which I believe both counsel are relying on. The focus is on the execution of this scheme, which must be separate from the offense when the ordinary or generic. And that was recognized

in the *Jim Wright* case in 2012. For example, the *Adepoju* court noted that nearly all bank fraud schemes, as Ms. Richardson pointed out, including misrepresentation and the use of another individual's information as such, additional complex and intricacies are required for the enhancement in a bank fraud scheme. However, the clumsy execution of a scheme should not be considered, instead the Court should look to especially complex or especially intricate planning involved in the fraud.

In sum, the Fourth Circuit has required that the sentencing Court consider the cumulative impact or the criminal conduct for the total scheme may be sophisticated when all the steps are linked together. And I believe that that's an argument made by the government. Here the totality of the scheme demonstrates that the sophisticated means enhancement is warranted. For one, the use of cryptocurrency made the traceability of funds much more difficult. In the run of the mill investment fraud schemes, defendants are paid by wire or check. Checks and wires could have been used to fund the bots here, but instead the defendant required cryptocurrency. With one exception being a single victim who didn't want to use cryptocurrency.

As detailed in Special Agent Thomas's declaration, the use of cryptocurrency layered with the European community creating intermediary wallets and then the cryptocurrency

being deposited into a pooled account made tracing the funds more difficult.

In fact, because the funds were first required to be converted to cryptocurrency, which were then transferred, placed in an intermediary wallet, and then held in a pooled account by the European company which luckily provided records. This case is similar to how shell companies are used in financial crimes to conceal funds and the scheme. As such, both the execution of the scheme and the concealment of the funds justified a sophisticated means enhancement, but notwithstanding the use of cryptocurrency. This scheme was designed to conceal the offense.

To start, Higgins registered FXP in St. Vincent and the Grenadines. He then claimed that FXP was overseen by a regulator in a different country in the Bahamas. However, the funds were actually deposited with a European company located in Poland. The combination of falsely claiming to be regulated in the Bahamas, registering the company in another Caribbean country, and using multiple overseas companies to commit this scheme in order to avoid United States regulatory authorities served as a means of concealment of the offense.

When all of the steps of the scheme are linked together, it is clearly sophisticated. The idea of having the algorithm trading on behalf of individuals is not something that anyone can accomplish. Indeed, a computer code had to be

written, which Higgins obtained and then edited. Both the FXP website and TradeAutomation websites contained a significant amount of content, including profitability, and numbers, and instructions.

In addition to the use of the two overseas companies, as well as the bots, this scheme was intricate as investors had to take multiple steps to even use the bots. Investors had to obtain cryptocurrency, they had to sign up for terms subscription with the TradeAutomation account. They had to transfer funds to FXP, and then had to link their accounts to FXP using TA Manager, which was created by another person believed to be in Russia.

A member of the conspiracy created fake online status reports and deleted certain trades from view so as to keep the losses hidden from investors and continue the frauds. These were acts of concealment, and, again, required, in this Court's view, from an analysis of the evidence, sophistication. If one invests in a typical FMP 500 stock through a reputable brokerage house, trades are not deleted. While any single aspect of the fraud here can arguably be considered not sophisticated, while looking at the fraud scheme in a whole, it is clear that the sophisticated means enhancement applies.

And I note your exception, Ms. Richardson.

MS. RICHARDSON: Thank you, Judge.

THE COURT: Are there any corrections, deletions, or modifications to the presentence report?

MS. RICHARDSON: No, Your Honor.

THE COURT: Very good. The presentence report is made a part of the record.

Is there any evidence from the government?

MS. SHARTAR: No, Your Honor. The government submitted the declaration to supplement its position paper. We are relying on that. My understanding is defense counsel is not planning on cross-examining the FBI agent.

THE COURT: Is that true, Ms. Richardson?

MS. RICHARDSON: Yes, it is, Your Honor.

THE COURT: Very good. Is there any evidence from the defendant?

MS. RICHARDSON: No, Judge.

THE COURT: The Court has had an opportunity to review the presentence report and the statements of people who support Mr. Higgins. And, obviously, will consider that as part of the record. The Court is also aware of the challenges Mr. Higgins faced while growing up and will consider that in potential mitigation of the sentence here.

I'll hear the government's argument on sentencing.

MS. SHARTAR: Thank you, Your Honor.

Your Honor, the nature and circumstances of the offense, especially considering the complex nature of the

scheme, the number of victims here, at least 299, and the amount of money invested, over $8 million, support the need for a guideline sentence.

One family member described the defendant as a self-made millionaire. He was actually a self-made millionaire, which was rooted in a complex and serious fraud. All of these point to why a guideline sentence here is justified and reasonable.

Regardless if the defendant did not pocket the full $8 million, but for this scheme, these funds would not have been lost by the investors. But to top it on top of the loss of $8 million, the defendant did have a chance early in the scheme to return the funds. There were significant losses in March of 2022. Many investors asked for their funds back. But the defendant did not return the funds. He actually went on to commit to go on a luxury spending spree. And this spending spree infiltrated all aspects of his life. From his home, to his cars, to the clothes, to the jewelry his wife wore, and the purses that she carried. While the consent order of forfeiture does -- has the return of some assets, these are just the assets that we knew to request back. And it still does not cover all of the funds that were taken, which is about over $1.5 million additionally.

The defendant took steps to justify not returning the funds. In the FAQ section of his website he wrote, "No

identification required or proof of age." But for some reason he did require identification to give people their money back. And this does not show him to be a compassionate person for others, because these individuals were the fountainhead of his riches. Indeed, the house was purchased in January of 2023. January 2023 was after many of the investors had requested their funds back and after the defendant had already been interviewed by the FBI.

While the defendant should be commended for what he has done for his brother, he did not need millions of dollars to do so. He did not need a $2 million home, he did not need luxury goods to be a role model. And while the home he came from, it was better, he also taught his brother to value the high life. Many of defendants have difficult childhoods, but that cannot be an escape for committing such a massive fraud. And I would like to note that the wedding he offered to his family member in the back of his home was of this $2 million mansion. And while the defendant did come in early, he did not come in until after the FBI had visited him twice and after they had searched his phone. The defendant clearly is hard working and ambitious, but he did not use this ambition to pursue a degree or pursue some other profession, he used it to commit a fraud for over 18 months.

Now, as the Court is well aware, the zero-point offender is a new change to the guidelines and when you take

that into consideration, previously his conduct actually would have been two points higher. And so, it would have been at a 26 and it would have been at a much higher rate of 63 to 78 months. As such, with the new guidelines, he is being sentenced at a lower level. He has been given a benefit for not having a criminal history. And as such, the guidelines are a good marker for what his sentence should be.

The sentence here needs to reflect the seriousness of the offense, to promote respect for the law, and to provide a just sentence. And it was interesting because a number of the victims wrote impact statements that actually speak to this factor. One should not be able to commit a significant fraud and not have to serve a meaningful term of imprisonment. It would not be a just punishment nor would it reflect the seriousness of the offense here. A term of imprisonment would also allow the defendant to potentially pursue an educational or vocational opportunity if he wanted.

Now, this is the first sentencing in the scheme and as the Court is aware another defendant Rick Rahim has since pleaded guilty. And Rick Rahim sold a number of investment platforms. This was just one. But this will serve as a means of comparison for Rick Rahim's sentence. And so I think that is something that the Court should think of in the back of their mind. So given all of the 3553(a) factors, the government submits that a term of incarceration is appropriate

here and specifically one within the guidelines.

The government will also like to take up two other matters. I'm happy to do it now or later and that relates to the consent order of forfeiture and the conditions of release. Would you like to hear that now, Your Honor?

THE COURT: Yes.

MS. SHARTAR: The consent order of forfeiture has been entered, as you know, and it was entered under seal. That does pose a challenge to the United States and the government should have recognized this earlier. But in order to finish the forfeiture process, there has to be advertising and notice given to the public. And that is under Federal Rule of Criminal Procedure Rule 32.2(b)(6). And the issue here is that with being under seal the government can't give notice to --

THE COURT: Is it your motion to take it out of seal?

MS. SHARTAR: Yes. So my understanding is that the defense does not object to that.

MS. RICHARDSON: I don't object.

THE COURT: Without objection. Taken out of seal.

MS. SHARTAR: I believe that is Docket No. 11, Your Honor, but it is the consent order forfeiture that was entered at the plea hearing.

And then as to the conditions of release after the

fact, the government would ask that while he's on supervision that he not be able to trade on behalf of others, that he not be involved in the investment-related business, that he not provide advice, products, whether that's for a fee, or not for a fee, and that he not serve as a fiduciary for any company.

THE COURT: Ms. Richardson, do you have any objections to those additional conditions of supervised release?

MS. RICHARDSON: No, Your Honor.

THE COURT: Very good. They will become a part of the additional supervised release conditions.

MS. SHARTAR: Thank you, Your Honor.

THE COURT: Thank you. Ms. Richardson.

MS. RICHARDSON: Good morning, Your Honor.

THE COURT: Still is.

MS. RICHARDSON: I'm trying to check.

Your Honor, Mr. Higgins is asking this Court today to issue a downward variance and sentence him below the guidelines. I know Your Honor has read and received my sentencing memo so I'm not going to delve super far into Mr. Higgins' background and history, but I'm sure this Court can see that it was fraud with obstacles.

THE COURT: You know, Ms. Richardson, in reading everything associated with this case, I struggled because I tried to make it make sense. From everything that I could

read, Mr. Higgins is a decent person. Obviously, he engaged in a fraud that is beyond the pale, but everything that I've read suggest that he is a person who came from a disadvantaged background, who was able to overcome. After he was caught, he actually found a job and was doing something productive and even people in his new aspiration had found him to be a good employee who shows up on time, wants to learn. I just couldn't make sense how a person who has at his core such a good sense could allow himself to get caught up in a scheme or a fraud which results in millions of dollars being lost to innocent people.

MS. RICHARDSON: I understand, Your Honor. And I do want to start off talking about acceptance of responsibility for Mr. Higgins.

Your Honor, I think Mr. Higgins is extremely apologetic for what he has done. He's remorseful, he's very sorry to the victims that he hurt. He does take full responsibility for his actions for severely misleading these investors, for failing to perform his fiduciary duties and for illegally -- excuse me -- illegally profiting a ton of money from these investors. He understands the seriousness of his actions and he has spent every waking moment trying to fix what he has done to make things right.

Your Honor, he spent over a year now thinking about his actions and confronting maybe the reasons why he did this,

confronting the damage and the loss that he's caused to these people.

Your Honor, he had a very hard time coming to terms with what he did when this investigation started. He's extremely ashamed of himself. He's working very hard to put his family back again. When Mr. Higgins met his coconspirator, Mr. Rick Rahim -- to be clear, Mr. Rahim is someone that's been arrested numerous times before and kind of makes a life and always has out of defrauding other people. He's notorious for it and he's someone with a ton of influence and charisma. And when Mr. Higgins met him, Your Honor, he was easily influenced and he was weak and he made bad decisions.

Your Honor, he trusted Mr. Rahim for reasons that are unknown even to him. And though he does take full responsibility for his part in all of this, he is trying very hard to make things right again. Your Honor, obviously, as Your Honor is aware, Mr. Higgins does have custody of his little brother. You read he fought tooth and nail to achieve that. His brother came from a life of neglect and abandonment just like he did and he knows that he cannot go back and fix what he's done. He's done it already, Your Honor. But he is making strides in trying to help repay these victims. He's voluntarily sold both of the Teslas he purchased. He sold the home in Florida. That's almost $2.5 million that the

government has been able to get back already and he hasn't even been sentenced. He's living in a very small apartment in Florida right now with his wife and his little brother. He works at Chick-fil-A, a place that he worked when he was younger and he's struggling to make ends meet. But, Your Honor, Mr. Higgins is living life as an honest man now and he really truly has learned from what he has done. And it's his first criminal conviction, albeit it's a big one. He was a law abiding citizen, again, like Your Honor said all of his life up until this conspiracy.

The Court knows how he grew up. How hard it is for someone with a life like that to avoid the system, and to handle -- excuse me -- to act honorably, to obey the law, but up until the time of this conspiracy, he was on the straight and narrow path, somewhere that he's now at again.

Your Honor, both his father and mother abandoned him at various times in his life. He took care of himself. At times he starved. And, Your Honor, he even lost his dream of trying to play music. He could not afford to pursue that path and he spent most of his life suffering from severe depression, which he's now handling appropriately with a therapist. Your Honor, obviously, Mr. Higgins is very concerned about losing his brother, but what I'll say is that he's more than his offense. And back to the question you asked, Your Honor, when he made the money from this

conspiracy, I truly believe that it went to his head. Your Honor, he could for the first time in his life buy the things he wanted, eat the foods he wanted, lived where he wanted, and in the moment he just did not focus on the damage that he was causing other people. But he sees it now. It was hard in the moment for him to see these people as real people. They just came up as figures on a screen. He didn't see them as real people, people with struggles like he's gone through. People with real lives and hopes, and retirement, and children, and dreams. But he sees it very clearly now the harm that he's caused. And he's heard the victim impact statements. Your Honor, we went through them together and it tears him up inside to know that what he contributed to and what he profited from.

He understands now that money, no matter how much he wanted it growing up, it can't buy happiness. He just wants to make his wife and his little brother proud from this moment on, and he's just asking Your Honor to consider who he can be in the future and all the good things that he has done in the past, not just his offense.

Sentencing him to a period of incarceration that is less than the sentencing guidelines meets all of the goals and objectives. He's gone from someone with no record to a convicted felon with a crime of moral turpitude on his record, a big one. He's never going to be able to get a good job

again. A lengthy sentence of incarceration is not necessary to deter him from committing future crimes. And regarding general deterrence, Your Honor, this is an argument that we go back and forth with every sentencing. I'm sure Your Honor saw the article that I filed with my memo from the Department of Justice. Your Honor, the National Institute of Justice says that sending a person to prison is not an effective way to deter crime. It says that prisons are great for punishing people and for keeping dangerous people out of the community, but particularly long sentences do not deter future crime.

THE COURT: But you would agree that some level of punishment is merited in this case?

MS. RICHARDSON: Yes, Your Honor. I'm not here asking for a supervised release and no incarceration. Your Honor, I understand that. I'm asking for a significant variance downward from the guidelines.

In regard to general deterrence, Your Honor, not many criminals know much about the sanctions for specific crimes in the first place. So I don't think that sentencing -- that bringing the hammer down on Mr. Higgins is all of a sudden going to cause fraud to stop. And the government also mentioned Rick Rahim and wanting to kind of compare the two cases. I don't think they're comparable, Your Honor. Mr. Higgins has never been in trouble in his life. Mr. Rick Rahim has numerous convictions on his records for fraud in

pending cases. So I don't think they're comparable to compare.

Again, Your Honor, he's never been to jail before. He grew up with no structure whatsoever. I think that he really needs some guidance. Obviously, this is the biggest wake-up call anybody could ever have and he wishes that he had had that call sooner. And as Your Honor can see from all the character letters, all the support, his family is here today, he -- he's a good man that did a bad thing.

And again, he's worked hard since all of this came to light. He's just been working at Chick-fil-A, but he's been steadily rising up the ranks. And it makes no sense for him to have worked so hard on this life, the last year, and have built himself up so far to have it all ripped away by an extremely lengthy sentence of incarceration. So I'm asking that Your Honor issue a variance below the guidelines in this case.

Also, Your Honor, as far as self-surrender goes, I would request self-surrender for Mr. Higgins. He was put on pretrial, I think, in January of this year. I will tell the Court, other than a speeding ticket and unknowingly operating a vehicle while operator's license suspended, those are the only two things, and none of those ended up with any type of disposition. Otherwise, he's been doing everything he's supposed to do on pretrial services. He's here today with the

understanding that he could be taken in. So he would just ask for a self surrender.

And then, I do believe the government does need to touch on restitution. I think that might have been left out. But, thank you very much, Judge.

MS. SHARTAR: She is correct. I did leave out restitution. And also, because the forfeiture order was previously entered, I just want to request the Court reference it or incorporate it into their judgment. That's something that we need for the papers.

And then as to restitution, we agreed to a minimum amount, but as you can imagine figuring out which part goes to which of the 199 investors is taking some time. We are conferring. The plea agreement does allow us to submit the restitution order after the sentencing. We are going to confer, and to the extent we can, agree upon something. We'll submit something jointly and if not we would ask for a hearing.

THE COURT: And again, I appreciate your hard work all the time, but make sure that it doesn't get away from us. In other words, let's do it as efficiently and expeditiously as possible.

MS. SHARTAR: Yes, Your Honor. Thank you.

THE COURT: You may stand, Mr. Higgins.

Mr. Higgins, I'm going to give you a predicate for

providing your allocution to the Court. And what I need to hear from you -- and your lawyer did a good job for you -- but what I need to hear from you is how and why you would allow yourself to get caught up in something like this because some people might say that it's just pure outright greed.

THE DEFENDANT: Sorry. I just wasn't thinking, Your Honor. I was handling being a new father to my brother. I had lost my grandmother at the time and I just wasn't thinking. I was just trying to provide the best home that I could to my little brother as he was -- sorry.

THE COURT: Providing a home for a loved one is a good thing, but did you need to have a $2 million home?

THE DEFENDANT: No, Your Honor. I just wasn't thinking. I just -- I think for me, I just wanted to give him the exact opposite of what he was given. And I just wanted to take him away from a home that was infested with bugs and he didn't have a bed, and I just wanted to give him everything I could, and I think that I just wasn't thinking. I should have been thinking about the other people.

THE COURT: What about the Teslas, did you need to give him those?

THE DEFENDANT: No, Your Honor.

THE COURT: What about the Rolex watches, did you need to give him those?

THE DEFENDANT: No, Your Honor.

THE COURT: I'm trying to understand -- and, again, I get it that you want to provide for a loved one. That's an admirable trait and admirable quality. What I'm trying to understand is if that was your driving force, why was it necessary to buy Rolex watches, Teslas and things like that.

THE DEFENDANT: I believe that it was the greed in me, Your Honor, that I coming with my past is the things that I had dreamt of as a child, and it wasn't right and I think that just wanting to have those things was covering up what I should have been looking into which was the victims.

THE COURT: My predecessor on the bench had an interesting story that I'm going to share with you, because I think it's important for you to hear. He talks about when he was growing up as a young man adolescent in Washington, D.C. that one day some of his so-called buddies came up to him and said, Hey, let's go out and get us some money. And they decided that they were going to go out and rob a bank. Well, my predecessor, obviously, didn't participate in that, but what happened with the three guys who did, two of them are dead now, and one of them is still in prison.

So it is about making life decisions at the time that you need to make the decisions. If my predecessor had elected to go with them, he would not have been able to pursue the path that he was ultimately able to pursue, but because he made a decision, and a decision that was an easy one for him

because he knew the difference between right and wrong and appreciated the difference between right and wrong, did not make the decision and was able to provide him and his family a better life. And so, I've always been of the view that life is about a lot of determinations and consequences that you need to face in your life and decisions that you need to make as you go about your life. And we all have temptations. I have temptations. You, obviously, have temptations. Everybody in this room has temptations. It's what you do in response to those temptations that are out there.

And as you've pointed out, you made an awful decision, because I think at your core you're a decent person. I really do. I read these reports and I try to get a feel for everyone that I have to sentence. And I think at your core you're a decent person, but greed overtook your decency and that's the concern that the Court has is whether or not this greed is going to continue to drive you for the rest of your life or whether that innate decency that you apparently have is going to be the barometer of the way that you live your life.

THE DEFENDANT: I understand, Your Honor. If I -- may I have a response to that?

THE COURT: Sure. And I want you to understand as you respond that you're breaking a lot of hearts right now. Your bride is back there crying, people that support you are

back there crying because they're wondering what is going to be next for you. They love you despite the bad things that you bring to the table because they care about you. So as you're going through this process, don't focus on me, me, me, focus on how you've impacted other people, including people that you say that you love.

THE DEFENDANT: Yes. Absolutely, Your Honor. I just wanted to say that I'm just very sorry for everything that I've done, and I will do whatever it takes to make it right. And whatever that means, I will make it right. All I can say is I'm very sorry for everything that I've done.

THE COURT: All right, sir. Anything else you want to say?

THE DEFENDANT: No, Your Honor.

THE COURT: All right, sir. You can have a seat beside Ms. Richardson.

Ms. Richardson, what I'm going to do is allow your client to remain seated during sentencing because the disposition is rather long.

MS. RICHARDSON: Your Honor, does that go to me as well or would you like me to remain standing.

THE COURT: You can sit down also, Ms. Richardson. That wouldn't be fair.

THE DEFENDANT: I appreciate it.

THE COURT: Considering the defendant's difficult

family situation that he appears to be genuinely remorseful for his conduct, I believe that a sentence that is slightly below even defendant's guideline calculation would be sufficient but not greater than necessary to send a strong deterrent message to defendant and the public that defrauding investors is a serious crime that carries serious consequences. I also note in the departure below the guidelines that the defendant has taken what are very, very serious approaches and efforts to return some of his ill-gotten gain to those who have been victimized by his actions and the Court is giving that significant consideration in the disposition.

As indicated earlier, the defendant objects to the probation's application of the two-level enhancement for sophisticated means pursuant to code. The Court has made its determination of that and is going to impose a sophisticated means.

Under the sentencing guidelines, the base offense level is 7, the value of the loss $4,272,437 was greater than $3,500,000 but less than $9,500,000. Accordingly, the offense level is increased by 18 levels. The offense involved ten or more victims resulting in a two-level increased enhancement because the offense otherwise involved, as the Court has previously stated a sophisticated means, and the defendant intentionally engaged in or caused the conduct constituting

this sophisticated means, the offense level is increased by another two levels.

The offense level is decreased by two levels because the defendant has clearly demonstrated an acceptance of responsibility for the offense. The defendant has assisted authorities in the investigation of prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea. As such, the offense level is decreased by one additional level.

The defendant meets the criteria of USSG Sections 4C1.1(a)(1)-(10). Therefore, defendant is a zero-point offender and the offense level is reduced by another two levels pursuant to code. This brings the defendant's total offense level to 24, the criminal history score is zero, and the criminal history category is Roman Numeral I. Accordingly, the applicable guideline range is 51 to 63 months imprisonment and the defendant's supervised release range is one year to three years. The fine range is 20,000 to $8,544,874. The applicable restitution amount is $4,272,437.

Pursuant to 18 U.S.C. 3553, the Court should consider the following: The nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed, to among other things, reflects the seriousness of the offense and adequately deter

criminal conduct, the kinds of sentences available, the guidelines, policy statements issued by the sentencing commission, the need to avoid unwarranted sentencing disparities among defendants with similar records, found guilty of similar conduct. And finally, the need to provide restitution to the victims of the case. Ultimately, under the *Booker* standard, the sentence must meet a standard of reasonableness.

Considering the 3553(a) factors with respect to the nature and circumstances of the offense, conspiracy to commit wire fraud is a serious offense and the defendant played an instrumental role in defrauding investors. The defendant's actions represent an indifference to our nation's laws and a callous disregard for the wellbeing of others who are financially and emotionally devastated when they lost their investments. Regarding the history and characteristics of the defendant, it is particularly troubling that the defendant's conduct appears to have been driven in large part by greed, as evidenced by the fact that the defendant continued purchasing luxury items even after investors had incurred major losses and requested their funds be returned.

Nonetheless, the Court acknowledges the defendant's challenging family circumstances and the defendant has expressed clear remorse and acceptance of responsibility for his role in the offense.

The Court next considers the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence of criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

The Court sentence takes into account that approximately 199 investors were victimized by the investment scheme, losing a total of at least $4,273,437.

The Court must impose a sentence that is significant enough to demonstrate to defendant and others, would be criminals, that defrauding vulnerable investors will have serious consequences. The guideline range for this offense is 51 to 63 months. The defendant's sentence which will include court ordered restitution will provide compensation to some extent to the victims of this offense.

Accordingly, the Court imposes a sentence of 36 months incarceration to be followed by three years of supervised release. As far as the request that the Court defer imposition of restitution until after sentencing, the Court will therefore set a restitution hearing for a date within 90 days of sentencing. If the parties are able to come to an agreement regarding a restitution plan prior to the

hearing date, they are directed to contact chambers and submit a proposed consent restitution order. The contact person for doing this is Ms. Drill.

The defendant's three-year term of supervised release shall be subject to the standard conditions of supervision as well as the following special conditions: If not paid in full by the time the defendant is released from custody, any remaining balance on the restitution shall be paid in equal monthly installment payments of $200 commenced within 60 days of release until paid in full. The defendant shall apply all monies received from income tax refunds, inheritance, judgments, and any anticipated or unexpected financial gains to the outstanding court order financial obligation, or in a lesser amount to be determined by the Court upon the recommendation of the probation officer.

The defendant shall not incur new credit card charges or open additional lines of credit without approval of the probation officer. The defendant shall provide the probation officer access to any requested financial information, including all personal, joint, and business assets from which he derives any benefit.

The defendant shall participate in a program approved by the United States Probation Office for mental health treatment. The cost of this program is to be paid by the defendant as directed by the probation officer. The

defendant shall waive all rights of confidentiality regarding mental health treatment to allow release of information to the United States Probation Office and authorize communication to the probation officer and the treatment provider.

The defendant shall not maintain the position of fiduciary capacity without permission of the probation officer. The defendant shall not use marijuana or cannabis in any form unless directed by a licensed medical provider. The Court adopts by reference the request for a supervised release conditions as articulated by the government in the prior part of this hearing and adopts those as part of the Court's disposition.

Recognizing that the defendant is likely not capable of paying the minimum fine prescribed by statute, the Court declines to impose a fine. The Court will, however, impose a special assessment pursuant to statute. The defendant has signed a Notice of Right to Appeal Sentence Under Limited Circumstances, signed by the defendant and his counsel and now the Court, and will make that part of the record in this matter.

Ms. Richardson, does your client have any objection to the conditions of supervised release that are imposed?

MS. RICHARDSON: No, Your Honor. But I will also let the Court know he has already paid the $100 special assessment.

THE COURT: Very good. Mr. Higgins, do you have any objections to the conditions of supervised release that have been imposed?

THE DEFENDANT: No, Your Honor.

THE COURT: Very good.

The Court will allow you to surrender at a later date. Tell me, how old is your little brother?

THE DEFENDANT: Your Honor, he's 14 and will be 15 in January.

THE COURT: Tell me as best as you -- I know that you have custody of him. If you are not the custodian, will your wife qualify as custodian?

THE DEFENDANT: I believe so.

THE COURT: Where is that to be disposed of? Where will that determination be made?

THE DEFENDANT: I'm sorry. I don't understand.

THE COURT: What Court will decide who has custody of your brother?

THE DEFENDANT: As of right now, I believe it is my wife and I who have the custody as of right now. We were given those papers in 2021.

THE COURT: So you and your wife have joint custody? Is that your understanding, Ms. Richardson, that they have joint custody?

MS. RICHARDSON: Court's indulgence.

THE COURT: Yes.

(Counsel and Defendant confers.)

MS. RICHARDSON: He believes it is joint. They believe it's joint, Your Honor, and I know the Court was in Tennessee that made the determination.

THE COURT: All right. My concern right now is I don't want this child to be in limbo as we work our way through his responsibility to meet his obligation.

What I'm going to do is this, I'm going to take it out a little further than I normally would because the primary reason is because I want this custody issue to be resolved. I don't want that child to be out there without a primary custodian while we work our way through the process.

So I'm going to direct that he report on January 6, 2025, to start his sentence. That way you can work your way through the process of dealing with the custodial issues regarding the child. I don't know how quickly or expeditiously Tennessee courts resolve these issues, but I want to make sure that this thing is settled so this child is not in limbo because right now that is one of my primary concerns.

MS. RICHARDSON: And, Your Honor, he would surrender to the U.S. Marshals here or in Florida.

THE COURT: Yes. Actually that's January the 9th. I looked at it wrong -- excuse me -- January the 6th. I've

got December up. January the 6th and he needs to do that at 9:00 a.m.

And failure to do so is a violation of the terms and conditions of the supervised release and there could be additional time tacked on if he doesn't show up.

MS. RICHARDSON: I just want to make sure I understand Your Honor, because he resides in Florida, would he fly here and turn himself in to the marshals?

THE COURT: I think that's probably the most efficient way to do it. Let me check.

(A pause in the proceedings.)

THE COURT: I want him to turn himself in here because I think it gets too complicated if we start having the Florida authorities involved. We still need to deal with the restitution issue and there are a lot of other issues that are going to preclude the Court from actually entering a judgment until those issues are resolved. So again, there are a lot of other things that have nothing to do with what he did but need to be resolved prior to we effectuating the purpose of the sentencing.

MS. RICHARDSON: Thank you, Judge.

THE COURT: Ms. Shartar, did you have a question?

MS. SHARTAR: No, I was just -- we were talking about that but the Court answered the question, and I think it would just be -- you mentioned it earlier incorporating and to

reference the consent order of forfeiture.

THE COURT: Yes.

MS. SHARTAR: Thank you, Your Honor.

THE COURT: Very good.

MS. RICHARDSON: He would stay on the current conditions that he's on?

THE COURT: He's still on the current conditions of supervised release. All the conditions that exist now while he's been on pretrial supervised release will apply.

MS. RICHARDSON: Thank you, Judge.

THE COURT: Mr. Higgins, you got a break today. What you did was obviously illegal. It was obviously unacceptable, it hurt a lot of people, but as I said, something tells me that somewhere deep inside all of your fraud there's a decent person in there. And so I'm sort of taking a chance that that decent person is going to actually come back out.

THE DEFENDANT: I appreciate that, Your Honor. Thank you.

THE COURT: All right. Thank you. The Court is going to take a ten-minute break. Ten-minute break. Let's go to 12:45. The Court is going to be in recess until 12:45.

**(Proceedings adjourned at 12:32 p.m.)**

<u>CERTIFICATE OF REPORTER</u>

I, Tonia Harris, an Official Court Reporter for the Eastern District of Virginia, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the Sentencing hearing in the case of the **UNITED STATES OF AMERICA versus IAN TAYLOR HIGGINS**, Criminal Action No.: 1:24-cr-26, in said court on the 28th day of August, 2024.

I further certify that the foregoing 42 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, my computer realtime display, together with the backup tape recording of said proceedings to the best of my ability.

In witness whereof, I have hereto subscribed my name, this September 11, 2024.

Tonia M. Harris, RPR
Official Court Reporter