**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RICK TARIQ RAHIM,<br><br>Defendant. | 23-CR-173 & 24-CR-179<br><br>Hon. Claude M. Hilton<br><br>Sentencing March 14, 2025 |

**DEFENSE MEMORANDUM REGARDING SENTENCING OF RICK RAHIM**

Rick Rahim has pleaded guilty to failure to file taxes and participating in a wire fraud conspiracy, and will appear before the Court for a consolidated sentencing in case numbers 23-cr-173 (tax) and 24-cr-179 (fraud) on March 14, 2025. On his behalf, the defense respectfully requests that the Court impose a total sentence of no more than 51 months of incarceration, followed by a term of supervised release.

The government's request for a sentence in the low end of the guideline range of 97 to 121 months is based in part of Mr. Rahim's conduct in the Western District of Virginia, which is the basis for a separate guilty plea, and which should be punished in that district, not by this Court. It is also based in part on mere suspicion that Mr. Rahim has continued to sell subscriptions to one of the products underlying his fraud plea. And it is based on the government's view that a guideline sentence is necessary to achieve the goals of sentencing in light of the scope and seriousness of Mr. Rahim's admitted offense conduct, and the conduct of his coconspirators.

But the guideline range driving the government's request is not properly calculated. And, because the government has agreed in the plea agreement to recommend a sentence at the low end of the applicable guideline range, the government's recommendation will necessarily change if the Court agrees with the defense's objections to the calculation.

In any case, a sentence anywhere near 51 months in length will be sufficient to achieve the goals of sentencing in this case. Some of the reasons for this are that:

- A sentence of more than 51 months would produce unwarranted disparity given that
  - Thiara received 18 months for offense conduct similar in scope to Mr. Rahim's;
  - Higgins received 36 months for conduct that was aggravated in ways Mr. Rahim's was not; and
  - more severe sentences for fraudulent activity are rare, and appear to be largely reserved for defendants who had already served serious sentences for similar conduct, which Mr. Rahim has not.
- 51 months of incarceration is profoundly serious punishment, particularly for someone who has never served any time, who is almost 60 years old, and who is not well.
- Evidence that tax and fraud crimes can be discovered, can be proved, and can result in a felony and serious prison time is sufficient to promote general deterrence.
- The combination of having been caught, 51 months of prison, supervised release, remorse, and the knowledge of what he has done to his family will be enough to specifically deter Mr. Rahim.
- The proposed sentence will promote greater recovery for the victims.

For these and the other reasons discussed below, the defense respectfully requests that the Court impose no more than 51 months in prison, followed by supervised release.

## DISPUTED GUIDELINE CALCULATIONS

In the parties' plea agreement, the government agreed to recommend a sentence at the low end of the applicable guideline range.[1]

The Presentence Report ("PSR"), concludes that the total offense level is 29, and that Mr. Rahim falls within criminal history category II, so that the range is 97 to 121 months. The defense objects to this calculation on several grounds, as outlined in a separate filing made today.[2] If all of the defense objections were sustained, the total offense level would be 24, and the criminal history category would be I, so the applicable range would be 51 to 63 months.

## NO MORE THAN 51 MONTHS OF IMPRISONMENT IS NECESSARY

### I. The Court must consider all of the factors in 18 U.S.C. § 3553.

It is now "emphatically clear" that the "Guidelines are guidelines—that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). The Court must keep in mind that, as the Department of Justice itself has noted, determining the Guidelines range is no substitute for an independent determination of a sentence that is "appropriate [and] serve[s] the interests of justice." *See* Government Supp. & Am. Sentencing Mem., *United States v. Stone*, No. 19-cr-18-ABJ, ECF 286 (D.D.C. Feb. 11, 2020) (requesting a sentence "far less" than the

[1] Plea Agreement in 24-cr-179 at ¶ 5, ECF No. 11; Plea Agreement Addendum in 23-cr-173 at 2, ECF No. 45. Note that citations to the record hereinafter will be to filings on the docket for the fraud case (24-cr-179), which are duplicated in the tax case docket (23-cr-173).

[2] *See* ECF 32 (Defense Objections to Guideline Calculations). *See also* PSR at 48-52.

"technically applicable" Guideline range because the range could have resulted in advisory sentencing ranges that are "unduly high," "excessive and unwarranted under the circumstances," and insufficiently reflective of the other Section 3553(a) factors); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009); *Spears v. United States*, 555 U.S. 261, 265-66 (2009); *Kimbrough v. United States*, 552 U.S. 85, 107-08(2007); *Gall v. United States*, 552 U.S. 38, 47 (2007); *Rita v. United States*, 551 U.S. 338, 351 (2007); *United States v. Booker*, 543 U.S. 220, 259–60 (2005). Ultimately, the central mandate of Section 3553(a) requires district courts to impose a sentence "*sufficient, but not greater than necessary*" to comply with the purposes of sentencing set forth in Section 3553(a)(2) (emphasis added). This requirement is not just another factor for the Court to consider along with the others set forth in Section 3553(a). Rather, it sets an independent limit upon the sentence.

## II. A sentence of no more than 51 months is reasonable given the nature and circumstances of the offenses, and the history and characteristics of Mr. Rahim.

As the Court can see from Mr. Rahim's letter (Exhibit 1), he offers no excuse for his offenses. Instead, because he intends to never again stray from the law, he has worked to identify what in him brought him to commit the offenses for which he has now accepted responsibility.

Mr. Rahim has been a prolific entrepreneur, succeeding in generating legitimate revenue through myriad businesses in the satellite, laser tag, pet care, and online resale spaces, to name a few. These successes are one reason he developed an optimism that another good idea, one that would earn him enough to both meet his

obligations and provide a comfortable life for himself and his family, was always just around the corner.

Though he has been right many times, this eternally optimistic and confident mindset has also sometimes led to putting off confronting challenges or costly obligations, and improvident spending or business decisions. For example, he put off confronting his growing tax debt to the Internal Revenue Service ("IRS") in part because he was sure he could come up with something that would permit him to pay off the agency without scaling back. And once he zeroed in on the idea of owning a multi-million-dollar investment software product business that earned enough to meet all of his obligations, he allowed himself to ignore anything inconsistent with that vision.

In 2021, Mr. Rahim thought he had discovered his next big thing. He had begun day trading and learning everything he could, and had begun confidently posting comments on his own TikTok site and Discord server about how others following him could learn from him and do as well as he (thought he) was doing, or surely soon would be. As he always is, he was on the lookout for ways to monetize, so he doesn't deny that he made sure that his videos showcased the trappings of wealth that he had accumulated. When he began to follow another TikTok user, UCC-A, who sold access to his "automated trading bot," used the bot, and found it promising, he contacted UCC-A about developing a product to market to his own online followers, and BFW was born.

As Mr. Rahim acknowledges, he let his optimism run away with him, and it was at the expense of others, because he lied to them to encourage them to sign up for a bot he marketed with UCC-A, Bots-for-Wealth, or BFW. Without being an expert in the area, or engaging in any vetting of UCC-A, he rushed through negotiating terms of their deal. He gave this stranger username and password access to the payment platform he would use to process customers' subscription fees, and he began marketing the bot to his online followers before its design or anything else was settled. And, as he has acknowledged, in his marketing, he obscured all of this (including that he did not personally develop the product), and exaggerated or made up facts suggestive of due diligence and testing that had not taken place, and generally portrayed as facts what were merely his hopes. His representations induced his customers not only to pay him monthly subscription fees that he was to split with UCC-A, but also to place investment funds into accounts at the mercy of UCC-A's bots, which only UCC-A controlled.[3] As confident as Mr. Rahim may have been in the product, he recognizes that this confidence was convenient to him, and there was no excuse for building up prospective customers' trust in this way.

Both he and his followers were initially pleased with how the BFW bots performed. He looked forward to earning returns on the funds he had personally tied to the bots, but also to earning monthly subscriptions he hoped would continue to roll in as customers remained satisfied with his partner's bots. But he admits that he

[3] PSR ¶¶ 101–107 (discussion of fraudulent statements with regard to BFW).

really had no reason to be surprised when his "partner" turned off the bots, causing accounts tied to the bots to drop in value.

Mr. Rahim acknowledges that he again failed his customers when he was dishonest with customers about the BFW failure, and when he turned from the demise of BFW to show the exact same lack of judgment and false marketing with regard to TradeAutomation ("TA"). Once again he did next to no vetting of his partners, UCC-2 and Ian Higgins (and his company FX Primary), or of other entities on which the business would rely; once again he rushed to market; and once again he allowed himself to take the outlandish online representations of UCC-2 and Higgins, whom he barely knew, to be facts, and repeated them to prospective customers.[4] Ever hopeful that the products they discussed would do well for him and his customers (as reflected in the fact that he too invested with these bots, and that he stood to gain from their success), he hid information from prospective customers and gave them false reasons to expect that they could trust this new business.[5]

There is no evidence that Mr. Rahim himself caused the sudden drop in the value of the funds his customers had tied to the TA bots in March 2022, or that he profited from it. There is also no evidence that he even knew that at some point Higgins withdrew over $4 million of investors' funds for his own use. But he acknowledges that his vouching led people to lose money when funds that customers had tied to the TA bot suddenly lost value and they struggled to extricate their funds

[4] *Id.* ¶¶ 111–120 (discussion of fraudulent statements with regard to TA).

[5] *Id.*

from FX Primary's control.[6] In short, he acknowledges that he prioritized earning subscription fees over honesty and the wellbeing of his customers. And he made the same types of misrepresentations when he marketed his own investment-related products, and when he induced two local men to allow him to trade $1 million for them. That is, he oversold his experience and his abilities, at the expense of his customers.[7]

As his letter demonstrates, Mr. Rahim recognizes that hoped-for ends did not justify using means he knew were wrong. He admits that this pattern was not only convenient to him, but unfair to others. He knows he must self-correct for his tendencies, and he must face up to what is hard. By agreeing to plead guilty and to work toward paying down his debt to his customers and the IRS, he has begun that process.

Although all of Mr. Rahim's assets are heavily encumbered and/or owned jointly, his wife has agreed to sell their property in North Carolina this spring to jumpstart his repayment of his customers and the IRS. He also believes the family will likely downsize from their family home after their three remaining high schoolers graduate in a few years, so that any equity flowing to him will flow to his victims. Finally, if a Fairfax court determines that he retains any interest in the home his

---

[6] *Id.* ¶¶ 121–126 (discussion of demise of TA, and customers' losses).

[7] *Id.* ¶¶ 127–136 (describing own investment signals business); 139–141 (describing actions with respect to two individuals).

mother owned when she died intestate, he will put anything that flows to him toward repaying the victims.[8]

## III. A sentence of no more than 51 months is necessary to avoid unwarranted disparity.

No two cases are exactly the same. But among useful points of comparison are *United States v. Thiara*, 1:23-CR-194-CMH, and *United States v. Higgins*, 1:24-cr-26-RDA.

### *A. Thiara received 18 months for offense conduct similar in scope.*

According to the government, Jasser Thiara, a gynecologist, reported "bogus deductions to the IRS" for three years, reporting $900K in income when he actually transferred in $4.6 million from one business, Thiara Group, to personal checking accounts that he controlled.[9] In the two years prior to that, he also organized a kickback scheme "in which he received approximately $2.2 million in kickbacks from a local pharmacist for referring patients for prescriptions with high reimbursement rates," including some prescriptions that were medically unnecessary, or which were billed to insurance but not filled or delivered to patients.[10] Thiara hid these funds by laundering them through accounts nominally owned by family members, and filed false returns. And for six years, he overbilled insurance companies, routed that money through another corporation, and also hid those receipts from the IRS to avoid

[8] Each of these properties is the subject of various liens.

[9] 1:23-CR-194-CMH, ECF 38 at 1.

[10] *Id.* at 1–2.

yet more taxes.[11] He also owned and operated an opioid clinic whose lead doctor was prosecuted for maintaining a drug-involved premises, and which led to Thiara being sanctioned by Virginia's medical board, and he lied to the IRS about income from this scheme as well.[12]

"In sum," to quote the government, "over an eight-year period," Thiara "crafted and expanded a meticulous set of lies. He played the role of a compassionate doctor, but in truth, treated patients like an ATM that could be used to bilk insurance companies and take advantage of the U.S. health-care system."[13] Between 2015 to 2020, he reported "approximately $3,021,613" in earnings, but he actually earned "more than $9.2 million, causing a tax loss of at least $3,172,001," a conservative estimate insofar as it did not "consider the distributions that Thiara received from his business Thiara Group, his unreported income from his pain clinic, []or his unreported income for the 2021 tax year."[14] And, he hid his unreported income by transferring it into nominee companies and accounts, "claimed extensive fraudulent tax deductions, and filed seven false individual tax returns for the 2015 to 2021 tax years and at least five false corporate tax returns."[15] He was allowed to plead guilty only to corruptly obstructing the IRS, which carried a three-year maximum, though the government estimated that he "defrauded the IRS of at least $3.1 million, and the

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.* at 3.

[15] *Id.*

defendant acknowledged in his plea agreement that he owes an additional $2.2 million to third-party victims."[16]

At sentencing, this Court found that the guideline range was 70 to 87 months.[17] But the Court sentenced Thiara to 18 months in prison.[18] The Court noted that the sentence reflected, among other things, Thiara's age (43), the various medical conditions he had presented to the Court, and "the fact that [he was] prepared to make immediate restitution."[19] These latter personal circumstances necessarily are different here. But because Thiara was also accused of multiple intertwining offenses stemming from persistent and multi-faceted dishonesty toward the IRS, insurers, and patients, imposing a sentence too distant from the 18 months imposed in that case would create unwarranted disparity.

### *B. Higgins's received 36 months for conduct that was aggravated in ways Mr. Rahim's was not.*

Another case the Court should consider is that of Ian Higgins, one of Mr. Rahim's partners in TA.[20] The government proposes that this Court sentence Mr. Rahim to nearly three times the sentence Higgins received (36 months). But a comparison of their cases shows that this would create unwarranted disparity.

---

[16] *Id.*

[17] 1:23-CR-194-CMH, ECF 63 at 37.

[18] *Id.* at 36.

[19] *Id.* at 36.

[20] PSR ¶ 27.

Higgins ran the company that was to serve as the "brokerage house" that was to "manage" the deposits and trades in the Forex market of any customers Mr. Rahim recruited to TA, FX Primary. Customers paid Mr. Rahim for the privilege of tying the deposits in FX Primary to TA's trading bot, which was supposed to take profitable positions for the customers.[21] Whereas Mr. Rahim earned subscription fees (that he was to share with Higgins and another partner), Higgins earned a fee every time a position was bought or sold by the bots, and Higgins had access to customer funds.[22]

According to the government's investigation, Higgins allowed Mr. Rahim to market the TA trading bot as something Mr. Rahim had developed, even though Higgins knew that he himself had just purchased the algorithm at the core of the trading bot from the internet and modified it.[23] He provided Mr. Rahim with statistics about past results that were false, knowing that Mr. Rahim would publish them.[24] He was aware of Mr. Rahim's other exaggerations about their relationship, the extent the bots had been tested, Mr. Rahim's personal familiarity with FX Primary and the ease with which customers could make withdrawals, and more.[25]

---

[21] *Id.* ¶ 118.

[22] *Id.*

[23] *Id.* ¶¶ 113–118. There was no evidence that Mr. Rahim knew of the exact origin of the algorithm, but he has admitted to lying when he said that he had developed it himself and that he fully owned it. *See Id.* ¶ 113.

[24] *Id.* ¶¶ 113–118.

[25] *Id.* ¶¶ 113–118. Notably, Mr. Rahim did place $100,000 of his own money with FX Primary to be traded by the bot he marketed to customers. *Id.* ¶ 114.

When customers incurred significant losses in 2022, Mr. Higgins deliberately made it hard for them to pull their funds out (by suddenly imposing "know your customer" rules he had not employed when customers were signing up), allowed the bots to keep triggering trades (so that he would continue to earn the fee on each position change), and eventually simply withdrew over $4.2 million of funds that had been entrusted to his company to manage.[26] "While Higgins was purportedly entitled to a processing fee, he withdrew more than he was entitled to,"[27] especially considering that many such processing fees were incurred despite customers' thwarted attempts to withdraw their money.

Mr. Higgins pleaded guilty just like Mr. Rahim. At sentencing, he was subject to a guideline range of 51 to 63 months (reflecting, among other factors, a loss amount that included the millions he had stolen outright).[28] His sentencing memorandum described a difficult upbringing, and his having taken in his younger brother, who had been essentially abandoned by his parents.[29] He had also been able to sell two Tesla vehicles and a home, which netted $2.5 million, which he put toward his forfeiture obligation before sentencing.[30] At sentencing, Judge Alston noted these

[26] *Id.* ¶ 126; Gov't Sent. Memo., *United States v. Higgins*, 24-cr-26-RDA, ECF 23 at 5 ("Higgins transferred over $4,200,000 of investors' funds to his personal bank accounts" and used such funds to purchase a $2 million dollar home, a Tesla, a timeshare, and watches and other luxuries from Rolex, Chanel, Tom Ford and more, including after investors requested funds back and after an FBI interview").

[27] PSR ¶ 126.

[28] 24-cr-26-001, ECF 28 (Minute Entry).

[29] 24-cr-26-001, ECF 22 (Def. Sentencing Pos.).

[30] *Id.*

factors, and Mr. Higgins's remorse, when he ordered that Mr. Higgins would serve 36 months in prison, to be followed by three years of supervised release.

Mr. Rahim did not report a difficult childhood, and he does not have the same ability to present at sentencing with a downpayment on his forfeiture or restitution obligations, given that most of what he owns he owns is co-owned and/or encumbered by debt exceeding its value. But, in any case, in comparing their cases for purposes of unwarranted disparity, it makes the most sense to focus on these defendants' respective conduct before considering their individual circumstances.

There are aggravating facts in Mr. Rahim's fraudulent conduct that were not present in Mr. Higgins's, such as that Mr. Rahim has admitted to marketing other products through falsehoods, not just the TA bot. Likewise, like Thiara, Mr. Rahim also committed tax offenses over several years. But there are significant aggravating facts in Mr. Higgins's case that are not present here, namely that Mr. Higgins outright stole over $4 million in investment funds investors had entrusted to his care. Moreover, even before that, Higgins kept details of his activities with investors' funds from Mr. Rahim. That is, Mr. Rahim has acknowledged that he materially misled his victims by feeding them false reasons to have faith in the bot and his partners. This included making false claims of having vetted them, and even the government acknowledges that there is no evidence that Mr. Rahim knew everything that Higgins did. *See* ECF 31-3 at 6 ("[I]t is unclear if Rahim knew that Higgins used a company to [sic] in Europe" to hold and manage their investments rather than, as Higgins claimed, housing the investments in his own company). Indeed, lack of total

transparency from Higgins is the only rational explanation for Mr. Rahim himself having signed up to use the TA bots that Higgins and UCC-B marketed through him, which the government also acknowledges. *See id.* at 7 ("Rahim also invested through FXP . . . .").

This comparison suggests that, for his differently aggravated conduct, Mr. Rahim should face *no more than* a sentence within the range that Mr. Higgins would likely have received before his sentencing judge took his mitigation into account (51 to 63 months), as there was no indication at sentencing that Judge Alston would have varied upward from that range in the absence of the mitigation that Higgins presented.

These two comparisons suggest that Mr. Rahim's sentence should fall somewhere in between the 18 months Thiara received for his wide-ranging tax offenses and other fraudulent conduct spanning many years, and the 51 to 63 months Mr. Higgins likely would have faced for his role in the TA fraud but for his unique mitigating circumstances, exactly what Mr. Rahim has proposed.

*C. More severe sentences for fraudulent activity are rare, and appear to be largely reserved for defendants who had already served serious sentences for similar conduct.*

Data from the sentencing commission also supports the conclusion that Mr. Rahim's sentence should fall in this range to avoid unwarranted disparity. Specifically, since 2019, the median sentence in fraud, theft, and embezzlement cases in which the defendant fell in criminal history category II and Zone D was just over two years, the average was under three years, and close to 80% fell under five years.[31] Indeed, this data suggest that only seven fraud







[31] U.S. Sent. Comm'n, Interactive Data Analyzer: Sentencing Outcomes, Sentence Type (hereinafter "IDA Fraud Data"), available at https://bit.ly/3V298Xb (last visited Mar. 3, 2025) (Fiscal Year: 2019, 2020, 2021, 2022, 2023; Circuit: All; State: Virginia; District: Virginia, Eastern; Race: All; Gender: All; Age: All; Citizenship: U.S. Citizen; Education: All; Crime Type: Fraud/Theft/Embezzlement; Guideline: § 2B1.1; Drug Type: All; Sentencing Zone: D; Criminal History: II; Career Offender Status: All). Note that Mr. Rahim has argued that he should fall within criminal history category I, but the defense searched for data for those in category II to provide conservative comparison points.

sentences fitting this description were longer than five years during this period.[32]

The Commission data does not provide case-level detail, but an informal survey of recent cases in which Federal Public Defender clients have received a sentence of more than five years for fraud in this district reveals that a good number of such sentences were imposed in cases in which the defendant had been previously convicted of, and served time for, earlier significant frauds, including as a result of prior federal prosecutions, and/or cases reflecting much greater losses:

- *Offill*, 1:22-cr-152-RDA (sentenced to 72 months for fraudulently obtaining and marketing shares of penny stock with co-conspirators, resulting in $1.3 million loss to investors, which was committed while defendant was on supervised release for previous federal conviction resulting from multimillion-dollar pump and dump scheme that had incurred 96-month sentence);
- *Drew*, 1:21-cr-71-AJT (sentenced to 46 months for bank fraud, and mandatory 24 months consecutive to that for aggravated identity theft, where criminal history category included a conviction for issuing bad checks, and who resumed stealing mail and identities when released on bond three times);
- *Rudin*, 1:22-cr-46-AJT (sentenced to 120 months for tax fraud conspiracy resulting in $19 million tax loss, as well as PPP loan fraud netting a $43 million loss, where defendant had prior federal bank fraud and aggravated identity theft convictions incurring 60-month sentence);
- *Abraham*, 1:19-cr-111-LMB (sentenced to 120 months for conspiracy to commit wire fraud falsely promising "standby letters of credit" for the price of $150,000 each from individuals and small businesses, netting approximately $1 million, where defendant had previously been convicted of fraud in federal court, incurring sentence of 54 months, and

[32] This comes from the IDA Fraud Data, *supra* note 31, which shows the detail of how many sentences fall within the above sections of the pie chart, though that detail cannot be captured through a screenshot.

In the same period, 65.4% of defendants who were in criminal history category II and Zone D of the sentencing guideline table and who were sentenced for tax offense under guideline Section 2T1.1 received sentences shorter than two years in length, and the median sentence was 15 months (the average being 23 months).

repeated the fraud on supervised release, incurring a six-month sanction, and also violated the federal order of pretrial release by continuing fraud);

- *Clark*, 1:19-cr-332-TSE (sentenced to 72 months for defrauding individual investors to invest in manufacture of JetBoard scheme using false contracts and other documents, but spent money on himself, where criminal history category of III included credit card fraud, insurance fraud, and stealing money from his parents using forgery and identity theft, and false statements to a lender, where defendant continued fraud while on state court pretrial release, and failed to appear on a federal summons despite promising to do so, forcing the government to arrest him on a warrant, and failed to appear in other fraud cases); and
- *Robb*, 1:24-cr-141-AJT (sentenced to 57 months for wire fraud for fraudulently inducing more than a dozen individuals to send him $2 million to be invested in a cryptocurrency trading bot that he did not deliver and actually spent on himself, where defendant had previously been sentenced to serve 27 months by a federal court for an earlier $4 million investment fraud, and later been convicted in state court of credit card fraud victimizing his uncle while absconded from supervised release from that first sentence, which incurred both a state sentence of three years, and a nine-month federal supervised release sanction).[33]

Thus, general trends and specific cases in this district in recent years reinforce the conclusion that a sentence like that the government requests would create unwarranted disparity, and a sentence like the defense requests is necessary to avoid it.

## IV. A sentence of no more than 51 months is sufficient to promote the goals of sentencing.

The Court must consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. 18 U.S.C. § 3553(a)(2)(A). The proposed sentence will do this.

[33] The factual representations above are taken from government sentencing memoranda filed in the listed cases.

*A. Incarceration for 51 months is profoundly serious punishment, reflecting the seriousness of the offense, particularly for someone who has never served any time.*

There is no denying the seriousness of Mr. Rahim's offenses, but a sentence of 51 months is a very serious sentence, particularly for someone like Mr. Rahim, who is nearly 60, who has not served any prison time in the past, and who is not well, as the Court knows from recent events, and from the PSR.[34]

And the proposed sentence would be significant punishment. Even a week of incarceration is serious: the incarcerated are stripped of personal effects, penned in, removed from their families, unable to earn a livelihood or support their loved ones, and deprived of agency over innumerable aspects of daily life, down to when to turn the lights on and off, and when to go outside. In Mr. Rahim's case, the sentence will ensure that he loses out on the last few years in which his children are in high school, an extraordinarily painful consequence for his actions. And the suffering inherent in incarceration will be amplified by his age and health challenges.

*B. Evidence that tax and fraud crimes can be discovered, can be proved, and can result in a felony and prison time is sufficient to promote general deterrence.*

The sentence would also "afford adequate deterrence to criminal conduct." *See* § 3553(a)(2)(B). As for general deterrence, empirical research has shown that, while certainty of punishment has a deterrent effect, "increases in severity of punishments

---

[34] *See* ECF 21; PSR ¶ 199.

do not yield significant (if any) marginal deterrent effects."[35] Research has not shown that this is different in the white-collar context.[36]

But even if it were the case that consequences others have incurred influence those contemplating criminal wrongdoing, then a four-and-a-half-year sentence would demonstrate to such people that both the "probability of conviction *and* significant consequences" are real, as the Tenth Circuit put it in *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) (emphasis added). Further, what constitutes "significant consequences" will vary case by case. *Id.* (concluding that other politicians might not be deterred upon learning that official convicted of bribery lost his law license as a collateral consequence of the discovery of his crime, as many of his peers may not have any such license). Given that most white-collar offenders are first-time offenders who have spent no time in jail, the combination of "the probability of conviction" and *any* sentence would be seen as "significant consequences," and a sentence like the defense proposes would be understood as a terrifying consequence.

[35] Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST.1, 28 (2006) ("Current knowledge concerning deterrence is little different than eighteenth-century theorists . . . supposed it to be: certainty and promptness of punishment are more powerful deterrents than severity."). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.* at 28–29.

[36] *See* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 448–49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

### C. *The combination of having been caught, 51 months of prison, supervised release, remorse, and the knowledge of what he has done to his family will be enough to specifically deter Mr. Rahim from reoffending.*

Likewise, any sentence in the range proposed, coupled with the knowledge that conviction is probable for future crimes, will be more than sufficient to promote specific deterrence of Mr. Rahim, and thereby protect the public. *See* § 3553(a)(2)(B), (C). There can be little doubt that each year that passed in which Mr. Rahim's failure to pay taxes did not result in any significant consequences contributed to his continuing to put off his tax obligations. But this experience has demonstrated to him that doing so only magnified the pain he was seeking to avoid: he owes the government the same as he always has, his avoidance led to a prosecution for failure to pay taxes and contributed to the government's determination to prosecute him for fraud (resulting in even more debt), and now, as a 56-year-old man with longstanding health issues, who is recovering from one back surgery and needing another, he is facing prison.

Further, prison is not the only way to encourage specific deterrence. Supervised release will also serve that goal. A federal probation officer will closely monitor his activity and finances when he is on supervised release, making it very difficult for Mr. Rahim to offend again, even if he were so inclined.[37]

And Mr. Rahim is not so inclined. His letter to the Court reflects that he is devastated that his wife and children will be without him, and face major life changes,

[37] As noted in the PSR, the defense has raised objections to only some of the proposed conditions of supervised release. PSR at 55.

due to his actions. He knows that it was trying to outrun his debts, and lying to himself and others, that have placed him in this position. He knows that failure to put his energy and focus into paying back his victims could land him back in jail, and that further offensive conduct virtually guarantees it.

The government insinuates that Mr. Rahim continues to earn money in connection with SnipeAlgo. *See, e.g.*, ECF 31 at 10. It is true that Mr. Rahim continues to post information about the product for anyone who has purchased the right to use it before he pleaded guilty to fraud in late 2024, and *chooses* to continue doing so, presumably because they like it. And, he acknowledges that he only belatedly began the work of scrubbing his websites of indications that he is accepting funds for this program. But he maintains that he has not continued to accept funds, and the government has offered no *evidence* that he has. For example, although the government notes that the website states in some places that customers can call Mr. Rahim's office to make payments, the government has access to any number of FBI agents who could have clandestinely made such a call and succeeded in making a purchase from Mr. Rahim if he were in fact still accepting customers. That they have not produced evidence of Mr. Rahim accepting money from an undercover agent or anyone else is all the grounds the Court needs to disregard the government's insinuations.

*D. The proposed sentence will promote greater recovery for the victims.*

Finally, the Court must consider the goal of promoting repayment of the victims. As the government acknowledges, Mr. Rahim does have a "strong knack for

business" and he has had "success in the business world[.]" ECF 31 at 27. The longer he is imprisoned, the longer he cannot put those skills to good use – with supervision – toward repaying his victims.

## CONCLUSION

For all of these reasons, and such others as may be offered at the hearing on this matter, the defense respectfully requests that the Court impose a total sentence of no more than 51 months in prison, followed by a term of supervised release.

Respectfully submitted on March 3, 2025.

**RICK RAHIM**
by counsel:

Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia

By: s/______________________________
Ann Mason Rigby
VA Bar No. 92996
Assistant Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
ann_rigby@fd.org

Richard Weber (*pro hac vice*)
Annette L. Favetta (*pro hac vice* pending)
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166
Telephone: 212-294-6700
Facsimile: 212-294-4700
rweber@winston.com

afavetta@winston.com